UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| | ) | |
| INDESCO INTERNATIONAL, INC., et al, | ) | Case No. 00-15452 (REG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| CONTINENTAL AFA DISPENSING CO., | ) | Adversary Pro. No. 04-3895 (REG) |
| (formerly known as Indesco International, Inc.) | ) | |
| and CONTINENTAL SPRAYERS | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| - against - | ) | |
| | ) | |
| AFA POLYTEK, B.V., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| AFA POLYTEK, B.V., | ) | Adversary Pro. No. 04-4128 (REG) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| - against - | ) | |
| | ) | |
| CONTINENTAL AFA DISPENSING CO. | ) | |
| (formerly known as Indesco International, Inc.), | ) | |
| and CONTINENTAL SPRAYERS | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

DECISION AND ORDER ON MOTION FOR SUMMARY
JUDGMENT

APPEARANCES:

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY  10019-6799
*Attorneys for Continental AFA Dispensing Company*
    *and Continental Sprayers International, Inc.*

By:    Andrew K. Glenn, Esq. (argued)
       Cara M. Ciuffani, Esq.

COHEN TAUBER SPIEVAK & WAGNER LLP
420 Lexington Avenue, 24th Floor
New York, NY  10170
*Attorneys for AFA Polytek, B.V.*

By:    Stephen Wagner, Esq. (argued)
       Sari E. Kolatch, Esq.
       Jed Lewin, Esq.

Facts ............................................................................................................ 2
Discussion .................................................................................................... 5
  I. Summary Judgment Standard ............................................................... 5
  II. Contract Interpretation ........................................................................ 6
  III. Preliminary Issues ............................................................................. 8
    A.  The Cross-Default Clauses .............................................................. 9
      1.  The CSI Sprayers License Agreement ........................................ 9
      2.  The OpAd Sprayers License Agreement .................................. 10
      3.  The OpAd Sprayers Supply Agreement ................................... 11
      4.  The Polytek Note .................................................................. 12
      5.  The Machinery Lease Agreement and CSI Parts Supply Agreement ...... 14
      6.  Summary ............................................................................. 14
    B.  Reading the Agreements Together .................................................. 15
    C.  Setoff .......................................................................................... 19
  IV. Continental's Claims and Polytek's Counterclaims ............................ 20
    A.  The Polytek Note .......................................................................... 20
      1.  Breach of Contract ............................................................... 20
      2.  Indemnification ................................................................... 25
    B.  The Machinery Lease Agreement .................................................. 25
    C.  The CSI Sprayers License Agreement ........................................... 30
    D.  The CSI Parts Supply Agreement .................................................. 39
      1.  Whether Polytek Provided Adequate Notice ........................... 40
      2.  Defective Parts .................................................................... 45
    E. The OpAd Sprayer Agreements .................................................... 50
      1.  Continental's Alleged Breaches ............................................ 53
        a.  Failure to Pursue the USA Detergent Letter of Intent ......... 53
        b.  Failure to Market OpAd Products ...................................... 55
      2.  Damages .............................................................................. 57
        a.  General vs. Consequential Lost Profit Damages ................. 57
        b.  Limitation on Damages in the OpAd Sprayers Supply Agreement ...... 60
        c.  Standards for Recovery of General vs. Consequential Lost Profit Damages ....... 62
        d.  Lost Royalties under the OpAd Sprayers License Agreement ............................ 63
        e.  Lost Profit Damages under the OpAd Sprayers Supply Agreement .................... 67
Conclusion ................................................................................................. 71

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In these related adversary proceedings under the umbrella of the chapter 11 cases of

reorganized debtors Indesco International Inc. and its affiliates ("**Indesco**"), each of the above-

captioned parties—Continental AFA Dispensing Company ("**Continental AFA**"), and

Continental Sprayers International Inc. ("**CSI**", and collectively with Continental AFA,

"**Continental**"),[1] and AFA Polytek B.V. ("**Polytek**")—is a manufacturer of sprayers used in

household products, such as spray cleaners.  Each of Continental and Polytek asserts claims

against the other for breach of contract, arising from one or more of six agreements relating to

their respective sprayer businesses that were entered into or updated as settlement agreements in

March 2002, in connection with the emergence from bankruptcy of Indesco, Continental's

predecessor.

As described more fully below, the Bankruptcy Settlement Agreements provided, in

general, that Continental and Polytek would:

> (1) supply each other with machines, molds, services, and finished
> products;

> (2) effectively divide their sales and marketing efforts; and

> (3) make specified payments to each other.

In these adversary proceedings, Continental seeks damages from Polytek in a five count

complaint on what are essentially four claims[2] for admittedly unpaid sums under the Bankruptcy

Settlement Agreements.  Polytek, in turn, seeks damages from Continental on four of its own

---

[1]        Indesco International (renamed Continental AFA) and CSI were the debtors.

[2]        A fifth claim seeks recoveries for fees and expenses on the first claim.

-1-

claims for alleged breaches of contract by Continental—and also asserts those claims as defenses to any obligations Polytek owed to Continental.

Continental moves for summary judgment, pursuant to Federal Rule of Civil Procedure ("**Fed. R. Civ. P.**") 56, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure ("**Bankruptcy Rule**") 7056, on all of the claims in either direction—for plaintiff's summary judgment on the claims Continental asserts against Polytek, and for defendant's summary judgment on the claims Polytek asserts against Continental.

Continental's motion is granted in part and denied in part, as set forth below and in a table attached to this decision laying out the disposition with respect to each claim.

FACTS

With all inferences drawn in favor of the non-moving party (here, Polytek), the facts underlying the motions are as follows.

The principal products of Polytek (a Dutch corporation) and Continental (whose companies are Delaware corporations with their principal places of business in Missouri), are trigger sprayers and other liquid dispensing systems.  The products include the older "T1000" and "T8500" models (designed by one of Continental's predecessors), and the newer "OpAd" trigger sprayer (designed by Polytek).

In 1997, Indesco was formed as a holding company to acquire Polytek, Continental AFA, and CSI, all of which were engaged in the sale of trigger spray devices.[3]  On January 1, 1999, CSI and Polytek entered into a ten year lease, pursuant to which Continental leased to Polytek

---

[3]       *See* Gratch affirmation, dated July 31, 2006, ¶ 3.

-2-

certain machines, equipment, and molds to be used in connection with the production of the older T8500 and T1000 sprayers in exchange for monthly payments.[4]

The joint venture did not last long, and in October 2000, prior to entering bankruptcy, Indesco sold its Polytek shares to Arbo Consult Nederland, B.V. ("**Arbo**") in exchange for $2 million in cash; a series of leases, licenses, and equipment; the assumption of about $8.2 million in debt; and a subordinated promissory note, by which Polytek agreed to pay Continental $350,000 (the principal), and 10% annual interest in quarterly installments until the principal became due in October 2003 (the "**Polytek Note**").  Additionally, as part of this transaction, CSI and Polytek entered into an agreement by which CSI granted Polytek an exclusive license to manufacture and sell T8500 and T1000 sprayers (the "**CSI Sprayers License Agreement**"), and an agreement by which Polytek granted Indesco a license to the newer OnePak technology and the right to exclusively manufacture, distribute, and sell OpAd spray devices in a defined territory (the "**OpAd Sprayers License Agreement**").  The parties also amended the 1999 Machinery Lease Agreement.[5]

On November 17, 2000, an ad hoc committee of noteholders filed an involuntary chapter 11 petition against Indesco.  Indesco consented to an order for relief, and the case continued in chapter 11.  On January 11, 2002, this Court entered an order confirming a plan which embodied a bankruptcy settlement, and pursuant to which a group of Indesco bondholders assumed control of Indesco.[6]  As part of this settlement, Continental and Polytek modified and restated their four previous agreements—the Machinery Lease Agreement, the Polytek Note, the CSI Sprayers

---

[4]    *See* Glenn declaration, dated July 10, 2006 ("**Glenn Decl. I"**), Ex. 4 (the "**Original Machinery Lease Agreement**").

[5]    *See* Glenn Decl. I, Ex. 5 (the "**First Amendment to the Machinery Lease Agreement**").

[6]    *Id.*

License Agreement, and the OpAd Sprayers License Agreement[7]—and entered into two new supply agreements—one that provided for Continental's sale of parts for the T8500 and T100 sprayers to Polytek (the "**CSI Parts Supply Agreement**"),[8] and the other that provided for Polytek's sale of OpAd sprayers to Indesco (the "**OpAd Sprayers Supply Agreement**").[9]  All six of these agreements, (collectively, the "**Bankruptcy Settlement Agreements**," or the "**Agreements**"), were executed on March 13, 2002.  These Agreements reflected a central plan designed to allow both Continental and Polytek to produce and market T8500, T1000, and OpAd sprayers.  Relevant details of the specific Agreements are provided in the Discussion.

In or about October of 2002, Continental and Polytek experienced apparent difficulties meeting their obligations under the Agreements.  Polytek asserted that Continental had failed to produce a coherent marketing plan for the OpAd spray devices.[10]  In response, Continental asserted that its efforts had shown that there was not a market for OpAd sprayers priced over 10.5 cents per unit, and that Polytek's demand that Continental pay 14 cents per unit was not reasonable.[11]  Over the following months, Continental and Polytek continued to communicate about Continental's inability to successfully market OpAd devices at 14 cents per unit, and Polytek claimed that any failure to sell OpAd devices resulted from Continental's failure to

---

[7]    *See* Glenn Decl. I, Ex. 6 (the "**Second Amendment to the Machinery Lease Agreement**"); Glenn Decl. I, Ex. 1 (the "**Polytek Note**"); Glenn Decl. I, Ex. 3 (the "**CSI Sprayers License Agreement**"); Glenn Decl. I, Ex. 7 (the "**OpAd Sprayers License Agreement**"), respectively.  Except as noted, all references to these agreements are as amended.

[8]    *See* Glenn Decl. I, Ex. 2.

[9]    *See* Glenn Decl. I, Ex. 8.

[10]   *See* Wagner affidavit, dated July 31, 2006 ("**Wagner Aff. I**"), Ex. M, Letter from Arthur Cooijmans to Tom Richmond, dated Oct. 18, 2002.

[11]   *See* Letter from Richmond to Cooijmans, dated Oct. 23, 2002, Wagner Aff. I, Ex. N ("**Richmond 10/23/02 Letter**").

pursue an aggressive marketing plan.[12]  On February 20, 2003, Polytek sent a letter to

Continental stating that because Continental breached the OpAd Sprayers License Agreement

and the Interim Supply Agreement and had failed to cure its defaults, Polytek was terminating

Continental's license under the OpAd Sprayers License Agreement and rights under the Interim

Supply Agreement and all related agreements, effective immediately.[13]  On August 6, 2004,

Continental sent a letter to Polytek notifying Polytek of its alleged defaults under the

Agreements.[14]  Shortly thereafter, both Polytek and Continental filed complaints against each

other.  After discovery, Continental moved for summary judgment.

Polytek admits that it has not paid Continental pursuant to these Agreements, and the

amounts due under the Agreements are not materially in dispute.  Rather, this Court has been

asked to consider the parties' conduct—including potential breaches of contract by either

party—to determine whether Polytek is excused for all or part of its payment obligations

pursuant to the Agreements, and whether Polytek itself is entitled to damages.

DISCUSSION

I.

Summary Judgment Standard

Summary judgment is appropriate if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there "is no

genuine issue as to any material fact" and that the moving party is "entitled to a judgment as a

---

[12]     *See* Letter from Cooijmans to Richmond, dated Dec. 12, 2002, Wagner Aff. I, Ex. O; Letter from
Richmond to Cooijmans, dated Jan. 6, 2003, Wagner Aff. I, Ex. P.; Minutes of Conference Call between
Cooijmans and Richmond, dated Jan. 28, 2003, Wagner Aff. I, Ex. Q.

[13]     *See* Letter from Yehochai Schneider to Richmond, dated Feb. 20, 2003, Wagner Aff. I, Ex. R ("**Schneider
2/20/03 Letter**").

[14]     *See* Letter from Richmond to Cooijmans, dated Aug. 6, 2004, Wagner Aff. I, Ex. S ("**Richmond 8/6/04
Letter**").

-5-

matter of law."[15]  The moving party bears the initial burden of showing that the undisputed facts

entitle it to judgment as a matter of law.[16]  The moving party may discharge its burden of proof

by demonstrating that "there is an absence of evidence to support the non-moving party's case on

which that party would have the burden of proof at trial."[17]

In determining a summary judgment motion, it is well settled that a court should not

weigh the evidence or determine the truth of any matter, and must resolve all ambiguities and

draw all reasonable inferences against the moving party.[18]  A fact is material if it "might affect

the outcome of the suit under the governing law…."[19]  An issue of fact is genuine if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."[20]

## II.
## Contract Interpretation

All six Agreements, without dispute, are governed by New York state law.  Under New

York law, "when parties set down their agreement in a clear, complete document, their writing

should as a rule be enforced according to its terms."[21]  "When the terms of a written contract are

---

[15]     Fed. R. Civ. P. 56(c), made applicable here by Bankruptcy Rule 7056.  *See Celotex v. Catrett*, 477 U.S. 317, 322 (1986) ("***Celotex***").

[16]     *See Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995); *Ferrostaal, Inc. v. Union Pacific R.R. Co.*, 109 F.Supp.2d 146, 148 (S.D.N.Y. 2000) ("The initial burden rests on the moving party to demonstrate the absence of a genuine issue of material fact . . .").

[17]     *Greenblatt v. Prescription Plan Servs. Corp.*, 783 F. Supp. 814, 819 (S.D.N.Y. 1992) ("***Prescription Plan Servs.***") (citing *Celotex*, 477 U.S. at 323).

[18]     *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986) (holding that summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party"); *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 262 (2d Cir. 2001); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) ("We…constru[e] the evidence in the light most favorable to the non-moving party.").

[19]     *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[20]     *Id.*

[21]     *CIBC World Markets Corp. v. TechTrader, Inc.*, 183 F.Supp.2d 605, 610-611 (S.D.N.Y. 2001) (Buchwald, J.) ("***TechTrader***") (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990) ("***W.W.W. Assocs.***")).  As noted in earlier decisions, "the Court fully concurs with the statements in *TechTrader* with respect to the legal principles to be applied with respect to motions for

-6-

ambiguous, however, a court may turn to evidence outside the four corners of the document to

ascertain the intent of the parties."[22]  [W]hen the language of a contract is ambiguous and there

exists relevant extrinsic evidence of the parties' actual intent, summary judgment is precluded.[23]

"Whether or not a writing is ambiguous is a question of law to be resolved by the courts."[24]  "[I]f

a contract is unambiguous on its face, its proper construction is a question of law."[25]

Therefore, the Court must decide whether the each of the six Agreements is ambiguous

with respect to the matters in controversy.[26]  Under New York law:

> [A] word or phrase is ambiguous when it is capable of more than a
> single meaning when viewed objectively by a reasonably
> intelligent person who has examined the context of the entire
> integrated agreement and who is cognizant of the customs,
> practices, usages and terminology as generally understood in the
> particular trade or business.[27]

If contractual terms have a definite and precise meaning and are not reasonably susceptible to

differing interpretations, they are not ambiguous.[28]  "[T]he court should not find the contract

---

summary judgment involving contractual interpretation, and finds the *TechTrader* discussion to be as capable, and concise, as any such discussion could be with respect to such matters." *ML Media Partners v. Century/ML Cable Venture et. al. (In re Adelphia Communications Corp.)*, 287 B.R. 605, 614 n. 23 (Bankr. S.D.N.Y. 2003).

[22]    *TechTrader*, 183 F.Supp.2d at 611 (citing *Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001); *Curry Rd. Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2d Cir. 1990)).

[23]    *TechTrader,* 183 F.Supp.2d at 611 (citing *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir.1994); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993)).

[24]    *TechTrader*, 183 F.Supp.2d at 611 (quoting *W.W.W. Assocs.*, 77 N.Y.2d at 162).

[25]    *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990).

[26]    *See TechTrader*, 183 F.Supp.2d at 611.

[27]    *Id.* (quoting *Shepley v. New Coleman Holdings Inc.*, 174 F.3d 65, 70 (2d Cir. 1999)) (with *TechTrader* having omitted quotation marks and citations in *Shepley*).

[28]    *TechTrader*, 183 F.Supp.2d at 611 (citing *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)).

ambiguous where the interpretation urged by one party would 'strain [ ] the contract language

beyond its reasonable and ordinary meaning.'"[29]

### III.
### Preliminary Issues

In defense against Continental's claims and in support of its own counterclaims, Polytek

contends that Continental breached some or all of the six Agreements, and that as a result,

Polytek was excused from performance and is entitled to a setoff.  Polytek argues that even if

Continental fulfilled its specific obligations under *some* of the six Agreements, the Court should

nevertheless find that Continental is in default under all six Agreements because the six

Agreements should be read as a single integrated contract.[30]  For support, Polytek points to

cross-default clauses contained in four of the six Agreements.[31]  Continental acknowledges these

cross-default clauses, but argues that there is no basis for treating the Agreements as a single

contract, and that absent a relevant cross-default clause, Continental's breach under one

Agreement should not constitute a default by Continental under another Agreement.[32]

Continental also argues that because all six Agreements are separate contracts, Polytek's claim

for a setoff does not prevent the Court from granting summary judgment for Continental on any

of its claims.[33]

Therefore, as a threshold matter, this Court must determine the extent to which the

breaches of one Agreement excuse performance by the non-breaching party under the other

---

[29]     *Law Debenture Trust Co. of New York v. Maverick Tube Co.*, 595 F.3d 458, 467 (2d Cir. 2010) (quoting *Bethlehem Steel Co. v. Turner Construction Co.*, 2 N.Y.2d 456, 459, 161 N.Y.S.2d 80, 93, 141 N.E.2d 590 (1957)).

[30]     *See* Polytek Opposition Br., at 27-29.

[31]     In general terms, a cross-default clause provides that a default on another agreement constitutes a default under the agreement containing the cross-default clause.

[32]     *See* Continental Letter Brief, dated Nov. 1, 2006 ("**Continental Letter Br. II**"), at 2-3.

[33]     *See* Continental Reply Br., at 19-20.

-8-

Agreements, and whether Polytek's counterclaims seeking a setoff preclude summary judgment on Continental's claims.

A.   The Cross-Default Clauses

Four of the six Agreements contain cross-default provisions.[34]  As Polytek has acknowledged, the CSI Parts Supply Agreement and the Machinery Lease Agreement do not contain any cross-default provisions.[35]  Of the four Agreements that do have cross-default clauses, each contains different language.

1.   *The CSI Sprayers License Agreement*

Article VI of the CSI Sprayers License Agreement states:

> 2.   Polytek shall be in default under this Agreement upon the occurrence of any of the following events (each an "Event of Default"), which shall be grounds for termination of this Agreement by CSI . . .
>
> > (b) A material breach by Polytek or any of its Affiliates in the performance of any covenant, representation or warranty under this Agreement or any other agreement to which Polytek or any of its Affiliates and CSI or any of its Affiliates are a party, that remains uncured beyond a period of thirty (30) days;
>
> 3.  If CSI or any of its Affiliates commits a material breach in the performance of any covenant, representation or warranty contained in this Agreement or any other agreement to which Polytek or any of its Affiliates and CSI or any of its Affiliates are a party, that remains uncured beyond a period of thirty (30) days, Polytek shall have all rights available at law or in equity, including, without limitation, the right to terminate this Agreement.[36]

---

[34]   *See* CSI Sprayers License Agreement, §§ 6.2(b) and 6.3; OpAd Sprayers License Agreement, § 10.1(ii); OpAd Sprayers Supply Agreement, §§ 7.1-7.4; Polytek Note, Art. VI, ¶ A(ii).

[35]   *See* Polytek Letter Brief, dated Oct. 25, 2006 ("**Polytek Letter Br. I**"), at 2.

[36]   CSI Sprayers License Agreement, §§ 6.2(b) and 6.3.

The plain language of these sections of the contract is unambiguous. Pursuant to section 2(b), if Polytek commits a material breach of any Agreement between the two parties, then Continental has the right to terminate the CSI Sprayers License Agreement *and Polytek is automatically in default under the CSI Sprayers License Agreement*. This is a cross-default provision. If Continental commits a material breach of any Agreement between the two parties, Polytek has the right to terminate the CSI Sprayers License Agreement (and has all other remedies available at law or in equity), but it does *not* automatically result in a default by Continental under the CSI Sprayers License Agreement. And although the contract gives Polytek "all remedies at law or in equity," the breach of one agreement is not automatically the breach of another agreement between the same parties unless either (i) the contracts are read together or (ii) the contract so provides. This one so provides, but only for a breach by Polytek.

2.   *The OpAd Sprayers License Agreement*

Articles X and XI of the OpAd Sprayers License Agreement, provide:

> 10.1 <u>Events of Default</u>. Licensee [Indesco] shall be in default under this Agreement upon the occurrence of any of the following events (each an "Event of Default"):
>
> > (ii) a material breach by Licensee [Indesco] in the performance of any covenant, representation or warranty under this Agreement or any other agreement to which Polytek or any of its Affiliates and CSI or any of its Affiliates are a party, that remains uncured beyond a period of thirty (30) days;
>
> 10.2 <u>Default by Licensor.</u> If Licensor [Polytek] commits a material breach in the performance of any covenant, representation or warranty contained in this Agreement or any other agreement to which Licensor [Polytek] or any of its Affiliates and Licensee [Indesco] or any of its Affiliates are a party, that remains uncured beyond a period of thirty (30) days, Licensee [Indesco] shall have all rights available at law or in equity, including, without limitation, the right to terminate this Agreement.

-10-

> 11.1 <u>Termination by Licensor.</u> Licensor [Polytek] shall have the
> right to terminate Licensee's rights under this Agreement if any of
> the following shall occur and be continuing: (i) the occurrence of
> an Event of Default under Section 10.1 of this Agreement that
> remains uncured beyond any applicable cure period . . ."

> 11.2 <u>Termination by Licensee.</u> Licensee [Indesco] shall have the
> right to terminate its performance under this Agreement if Licensor
> [Polytek] commits an Event of Default under Section 10.2 of this
> Agreement.[37]

The plain language here is also unambiguous. Section 10.1(ii) provides that if Indesco commits a material breach of any Agreement between the two parties, *then Indesco is automatically in default of the OpAd Sprayers License Agreement*. However, if Polytek commits a material breach of any other Agreement between the parties, Continental can terminate the OpAd Sprayers License Agreement, and Continental has any other remedy at law or in equity, but Polytek is not automatically in default of the OpAd Sprayers License Agreement.

Therefore, the cross-default provision in the here is also unilateral rather than reciprocal, but it runs for the benefit of Polytek upon a default by Continental, rather than for the benefit of Continental.

3. *The OpAd Sprayers Supply Agreement*

Article 7 of the OpAd Sprayers Supply Agreement, under which Continental was to purchase OpAd sprayers from Polytek, states:

> 7.1. <u>Events of Default</u>. Indesco shall be in default under this
> Agreement upon the occurrence of any of the following events
> (each, and [sic] "Event of Default"):

>> 7.1.3 A Material breach by Indesco or any of its Affiliates
>> in the performance of any material covenant . . . or any
>> other agreement to which both Supplier [Polytek] and
>> Indesco or any of their Affiliates, respectively, are a party
>> that remains uncured beyond a period of thirty (30) days.

---

[37]    OpAd Sprayers License Agreement, §§ 10.1-11.2.

7.2. <u>Default by Supplier</u>. If Supplier [Polytek] commits a material breach in the performance of any material covenant contained in this Agreement or any other Agreement to which both Supplier or any of their Affiliates, respectively, are a party that remains uncured beyond a period of thirty (30) days, then Indesco shall have all rights available at law or in equity.

7.3. <u>Termination by Supplier</u>. Supplier [Polytek] shall have the right to terminate Indesco's rights and Supplier's obligations and performance under this Agreement if a default under Section 7.1 shall occur and be continuing.

7.4. <u>Termination by Indesco.</u> Indesco shall have the right to terminate its performance under this Agreement if a default under Section 7.2 shall occur and be continuing.[38]

The language here is nearly identical to the provisions quoted from the OpAd Sprayers License Agreement. The cross-default provision in section 7.1.3 unambiguously provides that a default by Continental under any Agreement between the parties is a default under the Interim Supply Agreement. However, there is no cross-default provision providing that a default by Polytek under another Agreement is a default under the OpAd Sprayers Supply Agreement.

4. *The Polytek Note*

Article VI of the Polytek Note provides, in part:

A. . . . [E]ach of the following events shall constitute a default under this Note (a "Default"): . . .

(i) failure to pay any of the Subordinated Debt when due, by maturity, acceleration or otherwise, it being understood that failure to pay interest under this Note if Cash Flow is available and payment is not prohibited by the terms of Senior Debt shall constitute a Default;

(ii) failure to comply with any term or provision of this Note or any other agreement between the Maker and Payee including, without limitation, the Stock Purchase Agreement;

---

[38]        OpAd Sprayers Supply Agreement, §§ 7.1-7.4.

-12-

(iii) any warranty, representation or covenant made in connection with this Note or the Stock Purchase Agreement, shall be untrue or incomplete in any material respect; provided, however, that, if Maker violates any provision of the last paragraph of Article V of this Note, any such violation shall not constitute a Default unless and until ABN AMRO Bank has declared a default under the ABN AMRO Facility based upon the same act or omission by the Company;[39]

(iv) Maker or the Company becomes insolvent or the subject of a voluntary or involuntary proceeding in bankruptcy, or a reorganization, arrangement or creditor composition proceeding, or cease doing business as a going concern, or if there is filed or issued a levy or writ of attachment or garnishment or other like judicial process upon Maker or the Company, or is the subject of a dissolution, merger, or consolidation.

B.  Upon the occurrence of a Default, Payee [Indesco] may, at its option and without prior notice to Maker [Polytek], declare any or all of the Subordinated Debt to be immediately due and payable and charge interest at the default rate of two percentage points (2%) above the stated Interest Rate in Article IIA.[40]

Section (A)(ii) of this Article clearly contains a cross-default provision.  The issue is whether it applies only upon a default by Polytek, or whether it is reciprocal.

On the one hand, (A)(ii) says only "failure" not "Maker's failure."  This suggests that the cross-default clause applies to defaults by both Polytek and Continental.  The parties included the word "Maker" at the beginning of (A)(iv); if they intended the cross-default to only apply to a default by Polytek, they could have easily included "Maker" at the beginning of (A)(ii) to demonstrate that.  While (A)(i) also omits the word "Maker," it is clear that such a default could only be committed by Polytek, since only Polytek had an obligation to pay under the Note.  By contrast, the Stock Purchase Agreement imposed obligations on both Polytek and Continental; it

---

[39]     The "Company" is defined as ARBO Consult Nederland B.V.  See Polytek Note, at 1.

[40]     Polytek Note, Art. VI.

-13-

is thus entirely possible that Continental could have committed a default under another

agreement, such as the Stock Purchase Agreement, which would trigger (A)(ii).

On the other hand, although (A) states the following "shall constitute a default" without

specifying "by Polytek," it would be unusual that any party other than the maker could be said to

be 'in default' under a promissory note.  A promissory note only imposes obligations on a

maker; a payee (here, Continental) generally has no obligations under a note.  If, for example,

Continental had failed to turn over the stock to Arbo, that would provide Polytek with a defense

to payment on the note, but it would not constitute 'a default' by Continental under the note.  It

would make little sense to say that if Continental committed a material breach of an obligation it

owed to Polytek under a different contract, it would constitute default under the Note since, for

all intents and purposes, Continental could not be in default under the Note.

For these reasons, the Court finds that the language of the Polytek Note is ambiguous.

Without parol evidence, the Court is unable to determine whether the cross-default provision

applies to both parties or only to a default by Polytek.  While the latter reading may well turn out

to be the preferable one, the Court cannot now determine that as a matter of law.

5.  *The Machinery Lease Agreement and CSI Parts Supply Agreement*

The Court concludes that Machinery Lease Agreement and the CSI Parts Supply

Agreement contain no cross-default provisions.

6.  *Summary*

The CSI Sprayers License Agreement contains a cross-default provision that runs only

for the benefit of Continental upon the breach of another agreement by Polytek.  Both the OpAd

Sprayers License and Supply Agreements contain default provisions that run only for the benefit

of Polytek upon the breach of another agreement by Continental.  And finally, the Court cannot

determine the meaning of the cross-default provision in the Polytek Note on summary judgment.

B.   Reading the Agreements Together

Polytek further asserts that "even in the absence of an explicit cross-default provision . . .

as a matter of law, all of the agreements must be read together as one integrated whole."[41]

Therefore, Polytek asserts, a default under any one of the Agreements, by either party, would

constitute a default by the breaching party under any or all of the other Agreements.  In support,

Polytek cites to three cases from this Circuit.[42]

Under New York law, "[i]n the absence of anything to indicate the contrary intention,

instruments executed at the same time, by the same parties, for the same purpose, and in course

of the same transaction will be read and interpreted together, it being said that they are in the

eyes of the law, one instrument."[43]  *In Liberty USA*, Judge Batts of the Southern District of New

York read an asset purchase agreement and promissory note as an integrated whole where the

two were executed on the same day between the same parties, had a common purpose, and "the

Promissory Note is explicitly incorporated into the Asset Purchase Agreement, and is

specifically cited as part of the consideration for the contract." [44]

In *Vulcan Rail*, the New York Court of Appeals held that three agreements relating to

public contracts were to be read together where the agreements were executed at substantially the

same time and related to the same subject-matter, and where "[t]he contract between the

---

[41]     Polytek Letter Br. I, at 3. *See also* Hr'g Tr. 8/17/06 at 30-31.

[42]     *See Liberty USA Corp. v. Buyer's Choice Insurance Agency LLC*, 386 F. Supp.2d 421, 425 (S.D.N.Y 2005)
("***Liberty USA***"); *Nau v. Vulcan Rail & Contr. Co.*, 286 N.Y. 188, 36 N.E.2d 106 (1941) ("***Vulcan Rail***");
*Manufacturers & Traders Trust Co v. Erie County Indus. Dev. Agency*, 269 A.D.2d 871, 872, 703 N.Y.S.2d
636 (4th Dep't 2000) ("***Manufacturers & Traders***").

[43]     *Liberty USA*, 386 F.Supp.2d at 425 (citations omitted).

[44]     *Id.* at 426.

defendant and the city of New York was referred to in defendant's acceptance of plaintiff's offer and substantially made a part thereof, and the last writing referred and substantially made the acceptance a part of it."[45]

And in *Manufacturers & Traders*, a New York court held that two contracts must be analyzed as an integrated whole where the two contracts were contemporaneous, related to the same subject-matter, and "each agreement refer[red] to the other."[46]

Polytek argues that the six Agreements should be read together because all of the Agreements were executed simultaneously as "part of one unified and inseparable transaction"—the global settlement between Polytek and Continental—with the common purpose of resolving the litigation between the parties so that Indesco could exit from bankruptcy.[47]  While that statement, in part, is at least arguable true, New York law does not support reading these six Agreements as a single contract, and the cases cited by Polytek are clearly distinguishable from the facts here.

First, the six Agreements were not executed at the same time.  Although the final, amended, versions of all six Agreements were approved by this Court on March 13, 2003 as part of a unified settlement, four of the Agreements were simply amended or restated incident to the settlement, and had been originally executed two or three years prior.  And because four of the agreements were originally entered into *before* Indesco's chapter 11 filing, and before any litigation between Polytek and Continental, the six agreements cannot be said to have all shared the common purpose of resolving the litigation between Polytek and Continental.

---

[45]     *Vulcan Rail*, 286 N.Y. at 197.

[46]     *Manufacturers & Traders*, 269 A.D.2d at 872.

[47]     Hr'g Tr. 8/17/06 at 29; Polytek Opposition Br. at 27-28.

Second, the Agreements are not all part of a unitary transaction, and each agreement is supported by independent consideration.  Unlike in *Liberty USA*, where the promissory note was the consideration for the asset purchase agreement, the Agreements here are each independently supported by consideration.  The Polytek Promissory Note was consideration supplied by Arbo to Indesco in exchange for Indesco's shares in Polytek, and was not consideration for any of the other 5 Agreements between Polytek and Continental.  The licenses provided in the OpAd and CSI Sprayers License Agreements were granted in exchange for a promise to make royalty payments, not in consideration for any of the other Agreements.  Similarly, the Machinery Lease Agreement provided molds and equipment to Polytek in exchange for monthly payments by Polytek to Continental, and the two supply agreements both require payments by the purchasing party.

Some of the Agreements do contain cross-references.  The CSI Parts Supply Agreement references the CSI Sprayers License Agreement.  It states that "[t]he purpose of this letter is to set forth our agreement with respect to your supplying parts for those certain products which are the subject matter of that certain Technical Assistance and License Agreement."[48]  In addition, the OpAd Sprayers Supply Agreement and OpAd Sprayers License Agreement contain cross-references to each other.

In this case, the cross-references in the Agreements do not support reading them as one contract.  If the Agreements were read as one contract as Polytek urges, then, in effect, the Court would be reading cross-default provisions into the Agreements where they do not exist, and would be reading the unilateral cross-default provisions to be reciprocal.  Such a reading is inconsistent with the unambiguous language of the Agreements.  The fact that some of the

---

[48]     CSI Parts Supply Agreement, at 1.

Agreements here contain cross-default provisions and others do not, and that some cross-default

provisions run for the benefit of one party and not the other, evidences an intent on the part of the

parties that cross-default provisions run only where they are explicitly provided in the terms of

the Agreements.[49]  Similarly, treating the cross-references as a basis for reading the cross-default

provisions would make little sense; the parties knew how to include explicit cross-defaults in the

Agreements when they wanted to (and in the case of the OpAd Agreements, included both cross-

references *and* cross-defaults).

Moreover, *Liberty USA* instructs a court to read different agreements together only "[i]n

the absence of anything to indicate the contrary intention."[50]  Here, the fact that some of the

Agreements contained cross-default provisions and others did not indicates that the parties'

intent was the six Agreements should *not* be read together.  Because Indesco and Polytek, the

parties that negotiated and drafted these Agreements, are sophisticated parties, this Court will not

look beyond the explicit language of the Agreements, which are unambiguous on their face.

These cross-default provisions should be strictly enforced according to their narrow terms.[51]

By contrast, a good argument could be made that the two OpAd agreements should be

read together.  However, because both of those agreements contain cross-default provisions that

---

[49]    *See William P. Pahl Equipment Corp. v. Kassis*, 182 A.D.2d 22, 30, 588 N.Y.S. 2d 8 (1st Dep't 1992)
(denying reformation of a contract on the basis of mutual mistake, and finding that where memorandum of
agreement contained a cross-default provision but contract of sale did not, "[t]hat the contract of sale did
not contain a similar provision seems to us persuasive that the parties, sophisticated businessmen
represented by counsel throughout the negotiation, drafting and execution of the agreements, never
intended that one be included."), *lv. denied in part, dismissed in part*, 80 N.Y.2d 1005, 592 N.Y.S.2d 665,
607 N.E.2d 812 (1992).

[50]    *Liberty USA*, 386 F.Supp.2d at 425.

[51]    *See, e.g., Jones Apparel Group, Inc. v. Polo Ralph Lauren Corp.*, 3 Misc.3d 1107(A), 787 N.Y.S.2d 678
(Sup. Ct. 2004) (rejecting argument that "if there were a default in the Canada agreements, the U.S.
agreements would expire as well" where "the cross-default/expiration provisions in the Lauren Agreements
provide that a default or expiration of either of the United States agreements results in a default or
expiration of the Canada agreements, [but] the reverse is not provided for"), *aff'd* 791 16 A.D.3d 279,
N.Y.S.2d 409 (1st Dep't 2005).

run for the benefit of Polytek, the Court need not reach the issue of whether they ought to be construed as one contract.[52]

For these reasons, this Court declines to read the contracts together beyond what is required by the specific cross-default provisions.

## C.  Setoff

Continental argues that Polytek's claims for setoff do not preclude summary judgment. Continental is correct in part, but only in part.

"Offset claims do not bar summary judgment on promissory notes or other payment obligations, unless such obligations and the offset claims involve contractually 'dependent' promises."[53]

Because the Agreements are not to be read as a unitary contract, and each Agreement contains separate and distinct obligations, summary judgment on Continental's claims under one contract is not precluded by Polytek's counterclaims arising under *other contracts*.

However, both Continental and Polytek asserted claims (and counterclaims) for the other's alleged breaches of the CSI Sprayers License Agreement and CSI Parts Supply Agreement.  Polytek's claim under the CSI Sprayers License Agreement is clearly "contractually dependent" on Continental's claim under the CSI Sprayers License Agreement; they arise out of the same contract.  Therefore, summary judgment can only be granted on Continental's claim under the CSI Sprayers License Agreement if summary judgment is also granted on Polytek's

---

[52]    *See In re Kopel*, 232 B.R. 57, 65 n.4 (Bankr. E.D.N.Y. 1999).

[53]    *Computech Int'l v. Compaq Computer Corp.*, No. 02-Civ.-2628, 2004 WL 1126320, at *12 , 2004 U.S. Dist. LEXIS 9120, at *35 (S.D.N.Y. May 21, 2004) (quoting *Pereira v. Cogan*, 267 B.R. 500, 507 (S.D.N.Y. 2001)).  *See also Prescription Plan Servs.*, 783 F.Supp. at 823 ("[W]here a counterclaim presents an independent, unliquidated claim and presents no issue of fact as to the plaintiff's claim, the entry of summary judgment on plaintiff's claim is not only proper but is required." (internal citations omitted)).

-19-

counterclaims under the CSI Sprayers License Agreement, and vice versa.  The same is true for

the CSI Parts Supply Agreement.[54]

### IV.
### Continental's Claims and Polytek's Counterclaims

A.  The Polytek Note

On Claim #1, Continental seeks judgment in the in the amount of at least $350,000 plus

accrued interest totaling approximately $157,500 on the Polytek Note.  In Claim # 5, Continental

seeks judgment for all attorneys' fees, expenses, and court costs incurred to enforce its rights

under the Polytek Note.  In each case, Continental seeks plaintiff's summary judgment on those

claims.  Though the matter is close, the Court determines that ambiguities in the Polytek Note

make it impossible to conclude as a matter of law that Polytek has no defenses to these two

claims.  Thus, summary judgment on two claims under the Polytek Note is denied.

1.  *Breach of Contract*

As part of Indesco's sale of Polytek to Arbo, Polytek became obligated to Continental on

a subordinated promissory note effective October 19, 2000.  The note was subsequently

amended, with that amendment approved by this Court on March 13, 2002.  The terms of the

Note, with a principal amount of $350,000, required Polytek to pay interest to Continental at a

rate of ten percent per year in quarterly installments subject to certain conditions.[55]  The entirety

of the Polytek Note became due and payable on October 15, 2003.  It is undisputed that Polytek

has not made any payments on the interest or principal on the Note since its execution on

---

[54]     *See Created Gemstones, Inc. v. Union Carbide Corp.*, 47 N.Y.2d 250, 254, 391 N.E.2d 987, 417 N.Y.S.2d
905 (1979) ("On this appeal, plaintiff argues that the same factual issues which precluded a grant of
summary judgment on the complaint also dictate that summary judgment be denied as to the counterclaims.
More specifically, plaintiff contends that defendant's right to prevail on the counterclaims is dependent
upon whether it breached the contract.  It is correct.").

[55]     *See* Polytek Note, Art. II, ¶ A.

October 19, 2000.[56] Continental asserts that it is entitled to summary judgment due to Polytek's
failure to make any payments on the interest or principal. Polytek raised various defenses.

Polytek first asserts that the Note provides that all interest payments be derived only from
positive cash flow, and only when such cash is available, and argues that because Polytek has
had negative cash flow since 2000, with the exception of a brief period in 2003, it is excused
from payment of interest obligations under the Note, even now that the Note is mature.[57] The
Court does not agree.

Article II of the Polytek Note states:

> Interest on the principal from time to time outstanding shall accrue
> from the date hereof at the rate of ten (10%) percent per annum
> and shall be due and payable quarterly in arrears solely from the
> consolidated Cash Flow of Maker and the Company on the first
> business day of each calendar quarter and continue to accrue until
> paid in full.[58]

And Article I of the Polytek Note unconditionally states, "The entire principal of, and any unpaid
accrued interest on, this Note shall be due and payable on October 15, 2003."[59]

Even if Polytek is correct in asserting that it was not obligated to make periodic interest
payments due to its negative cash flow,[60] the Polytek Note did not provide that these payments
would be completely extinguished under such circumstances. The above-quoted language of the
Article II states that interest "shall be due and payable . . . solely from the consolidated Cash
Flow," but that interest shall "continue to accrue until paid in full." The cash flow condition is a

---

[56]    Continental Rule 7056-1 Statement, ¶¶ 24, 27; Polytek Rule 7056-1 Statement, ¶¶ 24, 27.

[57]    Polytek concedes that principal payments are not tied to cash flow availability. *See* Polytek Letter Brief,
dated Nov. 1, 2006 ("**Polytek Letter Br. II**"), at 1.

[58]    Polytek Note, Art. II, ¶ A.

[59]    *Id.* at Art. I.

[60]    Polytek has not explained why it failed to make the required payment(s) during its short period of positive
cash flow in 2003.

limitation on when interest will be *payable* (as well as due), and not on the *accrual* of interest.

The interest on the Note continued to accrue notwithstanding Polytek's payment or

nonpayment—and, pursuant to Article I of the Note, was properly due and payable on the

maturity date, October 15, 2003. Because Article I of the Polytek Note is unconditional, Polytek

became obligated to pay all accrued interest on the Note at maturity, regardless of Polytek's cash

flows.[61]

Second, Polytek argues that both interest and principal payments on the Polytek Note are

subordinate to the senior debt facility originally held by ABN AMRO and now held by ING.

Continental argues in response that the Note was subordinate only to the senior debt "in

existence" at the time the Note was made, and that the current debt held by ING was not then in

existence. On this point, I agree with Continental.

Article IV of the Polytek states:

> "Payment of the Principal Amount and interest under this Note (the
> "Subordinated Debt") shall be subordinated in right of payment to
> all loans, advances, liabilities, obligations, payments, capital
> leases, or other indebtedness of the Maker *existing on October 19,
> 2000*, whether evidenced by note, guarantee or other instrument or
> document, whether absolute or contingent, due or to become due,
> including, without limitation, all interest, charges, expenses, fees,
> and any other sums chargeable to Maker (the "Senior Debt").
> Subordination shall be on commercially reasonable terms
> satisfactory to the holders of Senior Debt. Senior Debt shall not
> include any obligations of Maker to the Parents or any Affiliate.[62]

---

[61]    Continental also asserted that evidence of the alleged negative cash flow that Polytek first provided with its
opposition brief was withheld from discovery despite Continental's document requests directly on point,
and therefore, should be stricken. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or
identify a witness as required by Rule 26(a) or 26(e), the party is not allowed to use that information or
witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially
justified or is harmless."). Counsel for Polytek admitted that Polytek did not provide a complete
production of documents with respect to the existence of negative cash flow and senior debt, but argues that
the failure was "harmless" and therefore, the evidence need not be stricken. *See* Hr'g Tr. 8/17/06 at 51.
The Court finds that even if Polytek did in fact have negative cash flows, Continental is still entitled to
payment. Therefore, the Court need not decide this evidentiary issue.

[62]    Polytek Note, Art. IV (emphasis added).

-22-

Thus it is clear from the language of the Polytek Note that the Note is subordinated only to debt that was in existence on October 19, 2000.  The ING Bank credit agreement is dated April 5, 2001, and it is undisputed that Polytek owed nothing to ING Bank before April 5, 2001.[63]  But Polytek argues that the ING Bank credit was "existing" on October 19, 2000 because it is the same debt as the ABN-AMRO Debt.  I disagree.

The ABN-AMRO credit facility, dated August 1, 1997, was "refinanced" with a loan from ING Bank, dated April 5, 2001.[64]  As the word "refinancing" implies, the money from the ING Bank credit facility was used to pay off the ABN-AMRO credit facility.  Therefore, the ABN-AMRO debt was extinguished on April 5, 2001.  The ABN-AMRO credit facility was not assigned to ING.  Rather, Polytek executed a new agreement with ING Bank, creating a wholly new credit facility.  The fact that the money from ING Bank was used to pay off ABN-AMRO does not mean that the debts under the two facilities are the same debt.[65]  Any other reading would lead to absurd results.[66]

Because the ING Bank credit facility was not in existence on October 19, 2000, it is not "Senior Debt" under the Polytek Note.  And Polytek has not provided evidence of any other

---

[63]    *See* Van Gogh Affidavit, dated July 14, 2006 ("**Van Gogh Aff.**"), Ex. D.

[64]    *See id.*

[65]    *C.f., Harder v. U.S.*, Civ. A. No. 91-10513-WD, 1993 WL 667770, at *8, 1993 U.S. Dist. LEXIS 12085, at *24 (D. Mass Aug. 18, 1993) (finding that "paying off a first loan with the proceeds of a second, without any manifestation that the parties intended simply to renew the first, is decisive evidence that the parties have extinguished the first obligation" even where the two loans were executed between the *same* parties); *In re Mulcahy*, 3 B.R. 454, 456 (Bankr. S.D. Ind. 1980) (noting that if debtors had gone to a third party lender and borrowed money to pay off first loan, that paying off would certainly have extinguished first debt and security interest).

[66]    First, the ING Bank Credit Agreement states "Purpose: Refinancing existing credit facilities." Van Gogh Aff., Ex. D (emphasis added).  If the ING credit facility were "existing" before April 5, 2001, as Polytek argues, then a purpose of the ING credit facility would have been to pay itself off.  And second, as noted by Continental, if the Polytek Note were subordinated to any "refinanced" debt, then Continental would effectively never be entitled to payment.

"Senior Debt." Therefore, the Polytek Note is not subordinate to any debt of Polytek.[67] The

language of the Polytek Note is clear on these issues. Because the ABN-AMRO "Senior Debt"

was extinguished in April 2001, and because the Note is mature, neither the subordination

provisions nor the cash flow condition excuse Polytek from payment of the interest and

principal. It is undisputed that Polytek has not paid Continental any of the $350,000 in principal

or $157,510 in interest that is due on the Polytek Note.

If it were to consider the issues of senior debt and cash flow in isolation, the Court would

find that there is no disputed issue of material fact, and that Continental is entitled to payment on

the Note as a matter of law. However, as determined above, the cross-default provision in the

Polytek Note is ambiguous. It may run only for the benefit of Continental, or it may be

reciprocal. If at trial, the Court finds that the cross-default provision in the Polytek Note is

reciprocal, and finds that Continental breached another Agreement between the parties, then,

pursuant to the cross-default provision, Continental is in default under the Polytek Note, and its

right to payment may be limited.[68] Accordingly, Continental's motion for summary judgment on

its claim for breach of contract arising from Polytek's default on the Polytek Note is denied.

---

[67]     Continental also asserted that that Polytek's debt under the Note is only subordinated to debt that is "commercially reasonable." Because the Court finds that Polytek's debt to Continental under the Note is not subordinated to the ING debt, the Court need not also address whether the ING debt must be or is "commercial reasonable."

[68]     In fact, Yehochai Schneider, co-managing director of Polytek, stated in his deposition that Polytek did not make payments on the Note because it believed that Polytek was entitled to a setoff. *See* Glenn declaration, dated Aug. 15, 2006 ("**Glenn Decl. II**"), Ex. 23 ("**Schneider Deposition Tr.**"), at 56-57, 63-64. Continental pointed to this statement as a reason for the Court to ignore Polytek's other defenses based on cash flow and senior debt. But Continental did not ask Schneider whether this was the *only* reason Polytek withheld payment, nor has Continental offered any other evidence to that effect. *See* Hr'g Tr. 8/17/06 at 4 ("The Court: … As I read the Schneider deposition testimony, he was asked a question in substance, 'So why didn't you guys pay it,' and he said, 'Because we had claims against you guys that exceeded it.' He was not then asked, 'Is that the only reason?' It is the implication, but he wasn't asked that.").

-24-

2.  *Indemnification*

In the Note, Polytek agreed to reimburse Continental AFA for "any and all costs and expenses [including court costs and attorneys' fees] in connection with the enforcement of [Continental AFA]'s rights under this Note."[69]  Continental seeks attorneys' fees, expenses and court costs incurred in enforcing its rights under the Polytek Note.  The language of the Note is clear and unambiguous, and the intent of the provision is unmistakable.  Polytek has not contested the validity of this provision.[70]  Polytek's only defense to this claim rests on the contention that Polytek has not breached its obligations under the Note.

Polytek has failed to meet its obligations under the Note.  But again, because of the ambiguous cross-default provision in the Note, Continental's motion for summary judgment for indemnification for all costs and expenses arising in connection with the enforcement of its rights under the Polytek Note is also denied.

B.  The Machinery Lease Agreement

On January 1, 1999, Continental and Polytek entered into the Machinery Lease Agreement, pursuant to which Continental agreed to lease Polytek certain machines, equipment, and molds to be used in connection with the production of the T8500 and T1000 sprayers.  This equipment included a "Mid-West" trigger pump sprayer assembly machine for manufacturing T1000 trigger sprayers, and a "Bodine" machine for producing T8500 sprayers, along with the machines' related parts and molds.

In Claim # 4, Continental seeks judgment in the amount of (i) at least $160,000, plus accrued interest for past due lease payments; (ii) approximately $1,824,000 pursuant to the

---

[69]     Polytek Note, Art. III, ¶ E.

[70]     *See* Polytek Rule 7056-1 Statement, ¶ 30.

Acceleration Clause; and (iii) attorneys' fees and expenses, and costs under the Machinery Lease Agreement.  Summary judgment in Continental's favor on these claims is granted.

The Machinery Lease Agreement provided that Polytek would pay $67,786 each month for the term of the 10-year lease.  The Machinery Lease Agreement was amended on October 19, 2000, at which time the monthly rent was reduced to $32,000, and then was amended again on March 13, 2002 (collectively, the "**Machinery Lease Agreement**").[71]

In support of its claim, Continental points to paragraph 9 of the Machinery Lease Agreement, which provides that:

> An event of default shall occur if:
>
> > (a) Lessee fails to pay when due any installment of rent and such failure continues for a period of 10 days,
>
> > (b) Lessee shall fail to perform or observe any covenant, condition or agreement to be performed or observed hereunder and such failure continues uncured for 15 days after written notice thereof to Lessee by Lessor . . .[72]

Paragraph 9 further provides that "Upon the occurrence of any event of default . . . Lessor at its option may: (a) declare all unpaid rentals and other sums due and to become due immediately due and payable."[73]

Continental also points to the so-called "hell-or-high-water clause" in paragraph 2 of the original Lease, which reads: "All rents shall be paid without notice or demand and without

---

[71]    Though the leased equipment and the monthly payments were modified by the amendments, the Machinery Lease Agreement as amended is otherwise substantially similar to the original Machinery Lease Agreement.

[72]    Original Machinery Lease Agreement, ¶ 9.

[73]    *Id.*

-26-

abatement, deduction or set-off of any amount whatsoever."[74]  Continental argues that this clause

prevents Polytek from asserting a setoff as a defense for non-payment.

As of the date of Continental's Complaint, Polytek had failed to make five monthly

payments, amounting to $160,000, and the remaining payments due under the lease were

approximately $1,824,000.[75]  In addition, the Machinery Lease Agreement contains no cross-

default clauses.[76]

Polytek makes various arguments in support of its position that Continental is not entitled

to payment, or is only entitled to payment in part, under the Machinery Lease.

First, Polytek argues that it was excused from making lease payments because Polytek

had stopped using the equipment.  Polytek cites Paragraph 13.1 of the Machinery Lease, which

provides:

> In the event that Polytek's utilization of the Mid-West . . . machine
> . . . is at 60% of the capacity of the machine or less, Polytek shall
> have the right to notify [Indesco] of such fact. Upon receipt of such
> notice, Indesco shall use its best efforts to obtain orders
> substantially equivalent to those theretofore fulfilled by Polytek
> using such machine so as to increase the utilization of such
> machine above 60% of its capacity.  If for any reason such
> machine is not utilized by Polytek above 60% of the machine's
> capacity within 60 days of Polytek's written notice of
> underutilization contemplated above, the lease shall automatically
> terminate and no further lease payments will be owed by Polytek.[77]

---

[74]    Original Machinery Lease Agreement, ¶ 2.  *See also First Bank Nat'l Ass'n v. Scripps Howard*, No. 94-
Civ.-3186, 1995 WL 548845, at *1-2, 1995 U.S. Dist. LEXIS 13301, at *1-2 (S.D.N.Y. Sept. 14, 1995)
(wherein similar language was part of a hell-or-high-water clause).

[75]    *See* Continental Summary Judgment Br., at 13.  Polytek did not assert that it had made any of these
payments and did not contest the dollar amounts of these allegedly due payments.  *See* Polytek Rule 7056-1
Statement, ¶¶ 13-14.

[76]    *See* Continental Letter Brief, dated Oct. 25, 2006 ("**Continental Letter Br. I**"), at 5; Polytek Letter Br. I, at
2.

[77]    Second Amendment to the Machinery Lease Agreement, ¶ 13.1.

Polytek asserts that "as a result of Continental's breach of the Amended License Agreement and failure to maintain the T1000 parents in Europe, Polytek was faced with much cheaper competition and was required to subcontract the manufacture of the sprayers in China in order to maintain the P & G business.  As a result, the Equipment was at 0% capacity."[78]

But the language of paragraph 13.1 of the Machinery Lease provides that Polytek is permitted to terminate the lease if the machine is operating at a capacity of 60% or less *only after written notice is provided to Indesco*, and Indesco fails to increase capacity.  This requirement of written notice is unambiguous.  Polytek has not suggested or provided any evidence indicating that it gave written notice of the low production to Continental.[79]

Moreover, assuming *arguendo* that Polytek had properly given notice and the lease terminated, the Machinery Lease provides that upon termination, "Polytek will cooperate in transporting the machine at CSI's and Indesco's cost and expense to such location as CSI or Indesco shall determine."[80]  Instead of returning the equipment, Polytek retained and has continued to use the equipment, despite Continental's demand for the equipment's return.[81]

Moreover, Polytek continuously failed to account for the location or status of the equipment.  It was not until after appearing before this Court that Polytek agreed to find out

---

[78]    Polytek Opposition Br., at 26.

Polytek attempts to obscure its failure to make lease payments by blaming the lack of capacity on Continental's alleged delinquency.  *See id*; Polytek Rule 7056-1 Statement, ¶ 13.  But whether or not Continental allowed patents to lapse is not a condition to Polytek's obligation to pay under the lease, and the Machinery Lease Agreement contains no cross-default provision.  This allegation is therefore irrelevant.

[79]     Schneider stated that "Continental was informed of the termination of production for our P&G in our Helmond facility, along with under-utilization of the Equipment."  Schneider Affidavit, dated July 31, 2006 ("**Schneider Aff.**"), ¶ 46.  However, he did not state that any written notice was ever given. In addition, Polytek did not allege that written notice was in fact provided; instead, Polytek argued that the Court should ignore the written notice requirement as futile.  *See* Hr'g Tr. 8/17/06 at 44-45.

[80]    Second Amendment to the Machinery Lease Agreement, ¶ 13.3.

[81]    *See* Polytek Rule 7056-1 Statement, ¶¶ 15-16.

-28-

about the status of the molds.[82]  In its letter brief dated October 25, 2006, Polytek notified this

Court that it had sent the molds to China for Polytek's use in the production of spray devices

there.[83]  Additionally, Polytek has now built its own molds.  Continental has not asserted any

claims arising from this possible misappropriation of the molds, but the Court is troubled by

Polytek's actions and late-game admissions.

Second, while Polytek admits that the Original Lease, executed on January 1, 1999,

contained a "hell-or-high-water" provision rendering its obligation to pay rent unconditional,[84] it

asserts that the amendments to the Machinery Lease Agreement "eviscerated" the hell-or-high-

water provision in the Machinery Lease, and therefore, that it is entitled to assert a setoff as a

defense for non-payment of rent under the Lease.[85]

Polytek argues that the First Amendment to the Lease eviscerated the hell-or-high-water

provision because it changed the amount of the lease payments and removed some of the

equipment from the Lease.[86]  This argument is without merit.  The parties did not effect a new

Lease; they simply amended the existing Lease, complete with all its provisions.  Language in

the First Amendment to the Lease specifically stated that there were "No Other Changes"[87] and

that "all other terms and conditions of the Machinery Lease Agreement [shall] remain in full

force and effect and unimpaired other than an adjustment for the Rent…."[88]

---

[82]     *See* Hr'g Tr. 8/17/06 at 72 ("Mr. Wagner: With regard to the molds, Your Honor, I don't know what the answer to that question is.  I think that we can find out with a phone call.  I don't know if [Polytek is] using the molds.  I don't know where the molds are.").

[83]     Polytek Letter Br. I, at 8; Declaration of Peter Dirkx, ¶ 4.

[84]     *See* Polytek Letter Br. I, at 3-4.

[85]     *Id.* at 4.

[86]     *See id.*

[87]     First Amendment to the Machinery Lease Agreement, ¶ 4.

[88]     *Id.* at ¶ B.

-29-

Polytek also suggests that paragraph 13.1 of the second amendment to the Machinery

Lease Agreement eviscerated the hell-or-high-water clause, since it allegedly "tied Polytek's

obligation to make lease payments to its utilization of the equipment 'notwithstanding any other

provision in the Agreement to the contrary.'"[89]  That interpretation of the Machinery Lease is

misguided.  The Lease does not "tie" Polytek's obligations to pay rent to any conditions

whatsoever.  Instead, as discussed above, paragraph 13.1 of the Machinery Lease provides for

the *termination* of the Lease if capacity falls below 60%, and Polytek provides written notice,

and Indesco fails to increase capacity.[90]  But it does not condition *the obligation to pay rent* upon

a 60% or greater capacity, or upon anything else.  And again, Polytek did not properly exercise

its right to notify Continental of its reduced production in writing, nor did it take any steps

toward terminating the Lease, as is clearly required in the Machinery Lease Agreement.

Polytek has failed to raise a disputed issue of fact, and has failed to provide a valid

excuse for non-payment of its obligations under the Machinery Lease Agreement.  Summary

judgment on Continental's claim for breach of contract arising from default on the Machinery

Lease is therefore granted, inclusive of all accelerated lease payments and interest.

C.  The CSI Sprayers License Agreement

In Claim # 3, Continental seeks judgment in the amount of at least $33,000, plus accrued

interest, attorneys' fees and expenses, and costs under the CSI Sprayers License Agreement.

The CSI Sprayers License Agreement, whereby Continental granted Polytek an exclusive

license to manufacture and sell T8500 and T1000 sprayers in Europe, Africa, and Asia in

exchange for royalty payments from Polytek, was first executed in conjunction with the sale of

---

[89]      Polytek Letter Br. I, at 4.

[90]      Second Amendment to the Machinery Lease Agreement, ¶ 13.1

Polytek to Arbo in October of 2000, and was then amended as a part of the bankruptcy

settlement on March 13, 2002.

Article V of the CSI Sprayers License Agreement provides that Polytek shall pay certain

royalties to Continental on a quarterly basis.[91]   And Article VI states:

> Polytek shall be in default under this Agreement upon the
> occurrence of any of the following events . . .
>
> (a) the failure to remit any payments due under this Agreement
>     when due, and such failure continues for ten (10) day after
>     notice thereof . . ."[92]

Polytek has not made any royalty payments since at least March 2004.[93]  Continental now seeks

at least $33,000 in royalty payments due and owing under the CSI Sprayers License Agreement.

Polytek argues that it was under no obligation to make these payments because

Continental breached its obligations under the Agreement by failing to maintain certain patents,

and by knowingly supplying licensed products to parties who resold them into Polytek's

exclusive territory.  Polytek also asserts a counterclaim for no less than $2 million in damages

that it allegedly suffered as a result of Continental's breach of the CSI Sprayers License

Agreement.

The Court determined above that the CSI Sprayers License Agreement contains a non-

reciprocal cross-default provision which provides that if Polytek commits a material breach of

---

[91]    *See* CSI Sprayers License Agreement, Art. V. The royalties due under the Agreement were a percentage of
Polytek's net sales of the T8500 and T1000 sprayers.

[92]    CSI Sprayers License Agreement, Art. VI.

[93]    *See* Continental 7056-1 Statement, ¶ 42 ("Polytek failed to make royalty payments on the Amended
License Agreement.").  Continental's letter of default sent to Polytek asserted the same.  *See* Richmond
8/6/04 Letter.  Although Polytek stated in its Rule 7056-1 Statement that paragraph 42 was "Disputed," it
stated in its opposition brief that it had stopped making royalty payments.  *See* Polytek's Opposition Br., at
11-12 ("Believing Continental had valid patents for the Continental Sprayers in the Territory, Polytek paid
royalties to Continental until some time in 2003.").  In addition, Polytek failed to provide any evidence that
it paid royalties to Continental after March 2004.

any Agreement between the parties, Polytek shall be in default under the CSI Sprayers License

Agreement.[94]   The Court also found that Polytek committed a material breach of the Machinery

Lease Agreement by failing to make rent and interest payments due under that Agreement.

Accordingly, Polytek is in default of the CSI Sprayers License Agreement as well.

Although Polytek defaulted under the CSI Sprayers License Agreement, the Court also

finds that material terms in the Agreement are ambiguous, and that Polytek has raised a disputed

issue as to whether Continental also breached the CSI Sprayers License Agreement.  Therefore,

summary judgment on Continental's claim and on Polytek's counterclaim is denied.[95]

Article IV of the CSI Sprayers License Agreement provides:

> During the Term, CSI agrees to grant and does hereby grant to
> Polytek an exclusive, perpetual license to manufacture, assemble,
> distribute and sell in the Territory, Licensed Products under the
> Technical Information provided by CSI hereunder and under all
> those patents within the Territory included in the Intellectual
> Property owned by CSI and in connection therewith to use the
> Intellectual Property.[96]

And Article X obligates Continental to "maintain and protect at its expense all Intellectual

Property licensed to Polytek under this Agreement."[97]   Intellectual Property is defined in the

License Agreement as:

> all of CSI's patents, copyrights, trademark rights, associated
> marks, trade names, logos, labels, designs and artworks used in on
> or related to the Licensed Products, whether or not registered

---

[94]     *See* page 9 above.

[95]     As explained above, Polytek's claim under the CSI Sprayers License Agreement is clearly "contractually
         dependent" on Continental's claims under the CSI Sprayers License Agreement.  *See* page 19 above.
         Therefore, the Court must deny summary judgment on both the claim and counterclaim.

[96]     CSI Sprayers License Agreement, Article IV.  "Licensed Products" are defined as "the trigger sprayer
         products manufactured, assembled, distributed or sold by Polytek prior to the date hereof pursuant to the
         license granted under the Original Agreement…".  *Id.* at Art. I, ¶ 3.  "Territory" is defined as Europe, the
         Middle East, and Africa.  *Id.* at Art. I, ¶ 7.

[97]     *Id.* at Art. X.

-32-

and/or applied for by Polytek in the Territory, *existing on the date hereof.*[98]

Because "Intellectual Property" is defined as intellectual property relating to the T8500 and T1000 sprayers that was *in existence* on the date of the execution of the Machinery Lease Agreement (March 13, 2002), Continental had a duty to maintain only the intellectual property that existed on that date, and not all intellectual property related to the T8500 or T1000 sprayers. But the parties dispute what intellectual property was "in existence" on March 13, 2002.

On March 13, 2002, Continental had a pending European patent application (No. 93902815.5), which had been filed on December 30, 1992. Sometime after the execution of the CSI Sprayers License Agreement, this application issued as EP Patent No. 0634989, which continues to be valid and enforceable in France, Germany, Italy, and the United Kingdom.[99] Patent application No. 93902815.5 clearly related to a "Licensed Product" under the Agreement, and was clearly in existence when the License Agreement was executed.[100] Therefore, it is "Intellectual Property" under the Agreement. And because this patent is still in existence, Continental did not breach the License Agreement with respect to this patent.

---

[98]   *Id.* at Art. I, ¶ 2 (emphasis added).

[99]   *See* Glenn declaration, dated Oct. 25, 2006 ("**Glenn Decl. III**"), Ex. 1 ("**Howell Decl**."), ¶ 3-6. Polytek did not dispute these facts.

[100]   Neither party distinguished between an *application* for a patent and an issued patent—treating both as a "patent" under the terms of the agreement. As one of Polytek's experts explained, "The filing of a patent application provides the application with provisional patent protection for the invention while the EPO considers the patent request. The application process can take several years . . ." Bartelds declaration, dated Oct. 25, 2006 ("**Bartelds Decl. II**"), ¶ 2. Therefore, the Court treats as irrelevant the fact that there was only an *application* for the patent pending on the date the CSI License Agreement was executed, and that the actual patent did not issue until after the Agreement was executed.

Continental also maintained a valid and enforceable design patent, UK Design 2030758 "Trigger Sprayer Design," which was in existence when the CSI Sprayers License Agreement was executed.[101]  Polytek argued that:

> [A] registered design is not a patent.  It relates to the aesthetics of an item, rather than the technology.  While it is a type of intellectual property—as is a logo or trademark—it provides substantially less protection than a patent.[102]

But the definition of "Intellectual Property" in the Machinery Lease Agreement includes not only patents, but also, "copyrights, trademark rights, associated marks, trade names, logos, labels, designs and artworks."[103]  This design patent is clearly a "design" related to the T1000 and T8500 sprayers.  Therefore, this patent was another piece of Intellectual Property that was adequately maintained by Continental pursuant to the Agreement.

Polytek asserts that Continental failed to maintain valid patents protecting "the majority of sprayers licensed to Polytek,"[104] and that other patents related to the T1000 and T8500 sprayers were not maintained.  And pointing to case law for support, Polytek argues that a patent licensor cannot collect royalties from a licensee on a patent after the patent has expired or has failed to be maintained.[105]

But the Court is not persuaded.  First, the CSI Sprayers License Agreement did not require Continental to maintain "a majority" of patents related to the sprayers, nor did it identify any specific patents that had to be maintained.  Continental only had a duty to maintain

---

[101]   *See* Howell Decl., ¶ 5.  *See also* Glenn Decl. III, Ex. 2 ("**Foster Decl.**"), ¶ 6.  Polytek did not argue that this design patent has lapsed.

[102]   Polytek Letter Brief II, at 3.

[103]   CSI Sprayers License Agreement, Art. I, ¶ 2.

[104]   Polytek Letter Brief II, at 4.

[105]   *See* Polytek Opposition Br., at 22-23 (citing *Brulotte v. Thys Co.*, 379 U.S. 29 (1965); *E.R. Squib & Sons v. Chemical Foundation*, 93 F.2d 475 (2d Cir. 1937); *Kaufman Malchman & Kirby, P.C. v. Hasbro Inc.*, 897 F.Supp. 719 (S.D.N.Y 1995)).

"Intellectual Property"—whatever patents, trademarks, etc. relating to the Licensed Products were in existence as of March 13, 2002.

Additionally, the royalties that Continental is entitled to receive under the Agreement are not for any specific patents or number of patents either; the royalties are for all Intellectual Property, *whatever it may be*, that was properly maintained after that date.  The Court finds that Continental did maintain some Intellectual Property—the EP Patent No. 0634989 and the Trigger Sprayer design patent.  Therefore, as long as Continental did not allow other Intellectual Property to lapse, thereby breaching the Agreement, it is entitled to collect the full royalties provided under the Agreement, even though the royalties may in fact only represent one patent and one registered design.

Under the terms of the CSI Sprayers License Agreement, Continental's failure to maintain a significant number of other patents related to the T1000 and T8500 sprayers would not constitute a breach as long as those patents were not "existing" when the Agreement was executed.  With respect to these other patents, however, the Court finds that the material phrase "existing on the date thereof" in the CSI Sprayers License Agreement is ambiguous.  In addition, the Court finds that Polytek has raised a disputed issue of fact as to whether there were additional patents that Continental subsequently failed to maintain that existed on March 13, 2002—in other words, whether Continental breached the License Agreement.

Polytek provided a declaration on from Erik Bartelds, a European patent attorney, which explained:

> A European patent application is a request pending at the European Patent Office ("EPO") for a patent related to a particular invention. The filing of a patent application provides the application with provisional patent protection for the invention while the EPO considers the patent request.  The application process can take several years and the applicant is required to pay an annual

-35-

> renewal fee to the EPO while the application is pending. . . . In the
> case of bankruptcy of the applicant, the proceedings before the
> EPO are interrupted and running time limits are "frozen." The
> proceedings will be resumed after the EPO has been informed
> which party is authorized to continue the proceedings. Any
> renewal fees that fell due during the interruption will then become
> due upon resumption of the proceedings. Thus, a company that
> informs the EPO about its bankruptcy can – when emerging from
> bankruptcy – still validly pay the renewal fees that came due
> during the period the applicant was in bankruptcy.[106]

Both parties acknowledge that at least two additional patent applications related to the

T1000 and T8500 sprayers (the "**Divisional Patents**") were pending before Indesco entered

bankruptcy in 2000.[107] It is also undisputed that by 2005, the applications for those two

Divisional Patents had expired.[108] But in light of the European patent process, it is not clear

whether they "existed" on March 13, 2002, the date the License Agreement was executed.

On the one hand, according to Polytek's own expert who conducted a patent search in

2003, the two Divisional Patents were deemed to have lapsed on July 2, 2001.[109] This would

suggest that the patents did not exist when the CSI Sprayers License Agreement was executed on

March 13, 2002, and therefore, they were not Intellectual Property that had to be maintained

pursuant to the Agreement.

On the other hand, Polytek points to numerous facts suggesting that the Divisional Patent

applications did "exist" on March 13, 2002. First, assuming Continental notified the European

Patent Office of its bankruptcy, Continental's patent applications for these two Divisional

---

[106]    Bartelds Decl. II, ¶¶ 2-3. Continental did not dispute this account of European patent law.

[107]    *See* Howell Decl., ¶¶ 7-8. These two patents applications, EP Patent Nos. 0819476 and No. 0819475, were so-called "divisional patent" applications of EP Patent No. 0634989, the so-called "parent patent" application.

[108]    *See* Bartelds declaration, dated July 28, 2006 ("**Bartelds Decl. I**") (stating search of Continental's patents in June 2003 revealed that all European patents other than No. 0634989 had expired). *See also* Continental Letter Br. I, at 2-3 (explaining that Continental had recently applied to revive the two Divisional Patents).

[109]    *See* Bartelds Decl. II, ¶ 6.

Patents were frozen and Continental was under no obligation to make renewal payments during the pendency of the bankruptcy.[110]  In addition, had Continental made the payments upon emergence from bankruptcy on March 15, 2002,[111] the patents would not have lapsed and would have "related back" to when they were originally filed.[112]  Second, since "[t]he filing of a patent application provides the application with provisional patent protection for the invention while the European Patent Office considers the patent request,"[113] if a third-party had begun selling sprayers in Europe that infringed on the Divisional Patents on March 13, 2002, Continental presumably would have been able to assert its intellectual property rights by pointing to the Divisional Patent applications.[114]  Third, other evidence presented by Polytek suggests that the head of R&D for Continental may have believed that some of these patents were still "active" as of May 8, 2002, *after* the execution of the License Agreement.[115]

---

[110]    *See id.* at ¶¶ 2-3.  As counsel for Polytek explained at the hearing, "the patents didn't lapse or weren't terminated in 2000 or 2001, they simply weren't being maintained." Hr'g Tr. 8/17/06 at 39.

[111]    The effective date of Indesco's chapter 11 plan was March 15, 2002, two days after the execution of these Agreements.

[112]    It is worth noting that when a divisional patent has fully expired, and then a new application for that patent is later refiled, the date of the second application for the divisional patent will relate back to the date of the first application, provided the parent patent application is still pending.  *See* Bartelds Decl. II, ¶ 7.

It has not been established whether the Divisional Patents were deemed to have lapsed on July 2, 2001 because (a) Continental never notified the European Patent Office of its bankruptcy or (b) Continental did notify the European Patent Office, but once it emerged from bankruptcy and failed to pay the accrued renewal fees, the date that the patents lapsed was deemed to relate back to the date they would have lapsed, but for the bankruptcy.

[113]    Bartelds Decl. II, ¶ 2.

[114]    Similarly, if Continental did in fact notify the European Patent Office of the Bankruptcy, then it is possible that on March 13, 2002 (or anytime during Indesco's bankruptcy), the European Patent Office records would have shown that the patent applications for the Divisional Patents were still pending.  Continental argues that "Polytek was a sophisticated party with the capacity to discover the status of Continental's patents via a simple patent search."  Continental Letter Br. I, at 3.  If on March 13, 2002, however, a patent search by Polytek would have shown that all or most of the relevant patents applications were still pending because Indesco was still in bankruptcy, that would render Continental's assertion moot.

[115]    In a letter dated May 8, 2002, Don Foster, head of R&D for Continental wrote, "My belief is that we should keep the [U.S.] patents on the list active.  We will also need to make a decision regarding foreign patents that do or will require annuity payments to keep the patents active."  Wagner affidavit, dated Oct. 25, 2006 ("**Wagner Aff. II**"), Ex. FF.  And in his deposition, when asked "As of May 8th, 2002, were the foreign

For these reasons, the Court finds that the term "existing on the date thereof" is ambiguous in this context. A reasonable trier of fact could find that the Divisional Patents (or any other similarly situated patents) were or were not "existing" on March 13, 2002.[116]

In addition, neither party disputes that the Divisional Patents were no longer in existence at some point after the License Agreement was executed. Because a reasonable trier of fact could find that the Divisional Patents "existed" on March 13, 2002 and expired sometime after, Polytek has raised a disputed issue as to whether or not Continental breached the CSI Sprayers License Agreement. Therefore, summary judgment for Continental on both its claim and on Polytek's counterclaim must be denied.

Polytek also argues that Continental's motion for summary judgment should be denied because Continental breached its obligations under the Agreement by knowingly supplying Licensed Products to parties who resold them into Polytek's exclusive territory. Continental responds in opposition by asserting that Polytek has provided no evidence to substantiate that

_____

patents on the 8500 still in place?" Foster responded, "Some of them may have been, some of them probably weren't." Wagner Aff. II, Ex. EE, at 110. Foster did also state that "There was a decision made prior to the bankruptcy to allow – because of the expense of foreign patents, to allow annuities on the patents in Europe of expire…." *Id.* But even if Continental did decide in 2000 to stop paying and let the European patents expire, Foster's testimony suggests that Continental thought that the European patents would not actually go into abandonment or expire until after the bankruptcy, which may have been the case. Of course, Continental's belief as to the existence of the patents is not dispositive of their existence.

[116]  Polytek also submits that Polytek and Continental both thought that multiple patents related to the T1000 and T8500 sprayers were in existence when the CSI Sprayers License Agreement was executed, and argues that "at the very least, the parties were mutually mistaken concerning the existence of the patents." *See* Polytek Letter Br. II, at 6. Generally, a contract entered into under a mutual mistake of a material fact is voidable and subject to rescission. *See, e.g., Gould v. Board of Educ. Of Sewanhaka Cent. High School Dist.*, 81 N.Y.2d 446, 453, 616 N.E.2d 142, 599 N.Y.S.2d 787 (1993); *Gulf Insurance Co. v. Transatlantic Reinsurance Co.*, 69 A.D.3d 71, 886 N.Y.S.2d 133 (1st Dep't. 2009). However, there is a "heavy presumption that a deliberately prepared and executed written instrument manifest[s] the true intention of the parties," and therefore, a "high order of evidence is required to overcome that presumption." *Chimart Assoc. v. Paul*, 66 N.Y.2d 570, 574, 489 N.E.2d 231, 498 N.Y.S.2d 344 (1986) (alteration in original). Even if Polytek could meet this burden, Polytek failed to raise the affirmative defense of mutual mistake in its Amended Answer. In fact, it was only raised in its second supplemental letter brief, filed after the hearing, and to which no further responsive papers were filed. Therefore, the Court not need address this defense.

claim, and that an affidavit supplied by Polytek on this issue should be disregarded because it contradicts the affiant's previous deposition testimony.[117]  Because summary judgment on this claim and Polytek's counterclaim is denied on other grounds, the Court need not now reach these issues.

D.  The CSI Parts Supply Agreement

In a letter agreement dated March 13, 2002, Polytek agreed to purchase, and Continental agreed to sell, parts for the production of T8500 and T1000 sprayers.[118]  It is undisputed that Continental sent, and Polytek received, the parts provided pursuant to the Parts Supply Agreement.[119]  It is also undisputed that that as some point, Polytek stopped paying for the parts that it received.[120]  Continental now seeks $153,000, plus accrued interest, as payment for the parts provided.

Polytek states that some of the parts it received from Continental were defective, and asserts a counterclaim for $500,000 in damages that it assertedly suffered as a result of Continental's alleged breaches of the warranties of merchantability and fitness for a particular purpose.  In opposition to Continental's motion for summary judgment, Polytek argues that it does not have to pay Continental for the defective parts, and that its counterclaim for damages

---

[117]     *See* Continental Reply Br., at 14-15.

[118]     *See* CSI Parts Supply Agreement, ¶ 1:

> So long as you continue to manufacture parts ("Parts") for the T8500 and T1000 and other products manufactured using the Mid-west trigger spray machine, you will continue to sell to us and we will purchase from you Parts on the same terms and conditions as we have been doing prior to this letter agreement, at current prices subject to adjustment (both upwards and downwards) for changes in the costs of the underlying raw materials as such changes occur, on a monthly basis.

[119]     Though neither party presented any evidence of delivery or receipt of the goods, Polytek never alleged that the parts never made it to Polytek.  Rather, Polytek alleges that the parts arrived, but were defective.  *See* Polytek Opposition Br., at 19-20.

[120]     *See* Continental Rule 7056-1 Statement, ¶ 34; Polytek Rule 7056-1 Statement, ¶ 34 ("It is undisputed that Polytek stopped paying for the defective parts.").

also offsets Continental's claim for payment.  The Court notes that the CSI Parts Supply

Agreement contains no cross-default clause.[121]

    1.   *Whether Polytek Provided Adequate Notice*

Under New York law, contracts for the sale of goods are governed by Article 2 of the

Uniform Commercial Code.  Under Article 2, when a buyer is not satisfied with the goods

received, the buyer can either accept all units, reject all units, or accept some and reject the

rest.[122]  "Rejection of goods must be within a reasonable time after their delivery or tender.  It is

ineffective unless the buyer notifies the seller."[123]  Goods are deemed accepted if the buyer does

not properly reject the goods after having a reasonable opportunity to inspect them, or if the

buyer "does any act inconsistent with the seller's ownership."[124]  Once goods are accepted, they

cannot be rejected.[125]

The buyer can revoke acceptance of any unit, but only when the good's "non-conformity

substantially impairs its value," and the buyer accepted the good either "(a) on the reasonable

assumption that its non-conformity would be cured and it has not been seasonally cured; or (b)

without discovery of such non-conformity if his acceptance was reasonably induced either by the

difficulty of discovery before acceptance or by the seller's assurances."[126]  In addition,

> Revocation of acceptance must occur within a reasonable time
> after the buyer discovers or should have discovered the ground for
> it and before any substantial change in condition of the goods

---

[121]    *See* page 14 above.

[122]    *See* U.C.C. § 2-601.

[123]    *Id.* § 2-602(1).

[124]    *Id.* §2-606(1)(c).  In addition, "after rejection any exercise of ownership by the buyer . . . is wrongful as against the seller." U.C.C. § 2-602(2)(a).

[125]    *See id.* § 2-607(2).

[126]    *Id.* § 2-608(1).

which is not caused by their own defects.  It is not effective until the buyer notifies the seller of it.[127]

"In order to effectively reject or revoke, the buyer must unequivocally communicate his intent to the seller."[128]  A buyer's "mere complaint about the goods does not constitute clear and unequivocal act of rejection."[129]

Two cases are instructive here.  In *Ask Technologies*, a case from this district, the buyer of computer hardware claimed that he rejected or revoked acceptance of the goods because he had communicated his dissatisfaction to the seller by means of letters and phone calls.  Despite these complaints, the court found that the buyer had accepted the hardware because the seller had quickly repaired many of the defects and the buyer had used the hardware for nine months following installation.[130]  And in *Sears, Roebuck*, a New York state court found that "the undisputed evidence of defendant's continued retention and use of the boiler for a substantial period of time, covering several heating seasons, despite plaintiff's orders to remove the boiler and credit her account, constitutes an acceptance."[131]

In sum, retaining the goods—rather than returning them or making them available for return to the seller—constitutes acceptance, even where the buyer notified the seller that the goods received were defective.

---

[127]    *Id*. § 2-608.  The basic requirements for rejection and revocation of acceptance are the same, although the buyer must satisfy additional requirements to revoke.  *See id*.; *id.* § 2-607(1).

[128]    *Ask Technologies Inc. v. Cablescope, Inc.*, No. 1-Civ.-1838, 2003 WL 22400201, at *3, 2003 U.S. Dist. LEXIS 18694, at *7 (S.D.N.Y. Oct. 20, 2003) ("*Ask Technologies*") (citing *Sears, Roebuck & Co. v. Galloway*, 195 A.D.2d 825, 826, 600 N.Y.S.2d 773 (3d Dep't 1993) ("***Sears, Roebuck***")).  The basic requirements for rejection and revocation of acceptance are the same, although the buyer must satisfy additional requirements to revoke.  *See* U.C.C. §§ 2-607(1), 2-608.

[129]    *Maggio Importato, Inc. v. Cimitron, Inc.*, 189 A.D.2d. 654, 592, N.Y.S.2d 325, 326 (1st Dep't 1993) *lv. Denied*, 82 N.Y.2d 652, 601 N.Y.S.2d 582, 619 N.E.2d 660 (1993).  *See also White v. Schweitzer*, 221 N.Y. 461, 465, 117 N.E. 941 (1917) ("Mere complaint by the vendee that the goods do not come up to the contract does not amount to rejection.").

[130]    *Ask Technologies*, 2003 WL 22400201, at *3, 2003 U.S. Dist. LEXIS 18694, at *7.

[131]    *Sears, Roebuck*, 195 A.D.2d at 826.

Under the U.C.C., even if goods are accepted and acceptance is never properly revoked, the buyer can still recover damages for defective goods.[132] But "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."[133] In addition, "[t]he burden is on the buyer to establish any breach with respect to the goods accepted."[134] U.C.C. § 2-714, which governs a buyers damages for breach in regard to accepted goods, provides:

> (1) Where the buyer has accepted goods and given notification (subsection (3) of Section 2-607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
>
> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> (3) In a proper case any incidental and consequential damages under the next section may also be recovered.[135]

And U.C.C. § 2-717 allows a buyer to "deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract."[136]

As previously noted,[137] rejection and revocation require that the buyer unequivocally communicate his intent to reject or revoke and that the buyer not act inconsistently with the

---

[132] *See* U.C.C. §§ 2-607(3), 2-714. *See also, Cliffstar Corp. v. Elmar Industries,* 254 A.D.2d 723, 724, 678 N.Y.S.2d 222, 223 (4th Dep't 1998) ("***Cliffstar Corp.***") (finding that buyer was not precluded from recovering for seller's breach of contract and breach of warranties even though buyer had not rejected or revoked acceptance where buyer had provided adequate and timely notice to seller of defects).

[133] U.C.C. § 2-607(3). The buyer is also entitled to damages if he rejects or if acceptance is properly revoked. *See id.* §§ 2-711(2).

[134] *Id.* § 2-607(4).

[135] *Id.* § 2-714.

[136] *Id.* § 2-717.

seller's ownership.  But in contrast, a buyer's right to damages for accepted goods under U.C.C.

§ 2-607(3)(a) is preserved as long as he provides notice to the seller within a reasonable time

after he detects the defect.[138]  "[T]he drafters of the UCC did not intend a rigorous test to

determine the sufficiency of notice; it can be oral as well as written, and it need not describe

every objection to the transaction."[139]  "The notification need only alert the seller that the

transaction is troublesome and does not need to include a claim for damages or threat of future

litigation."[140]  In addition, "Timeliness is governed by the standard of reasonableness and is a

question of fact."[141]

As evidence of notice, Polytek relies on the affidavit of Jos Van Gemart, Manager of

Quality Assurance for Polytek, and the deposition testimony of Yehochai Schneider, Managing

Director of Polytek.[142]  Schneider testified that Arthur Cooijmans, Polytek's former Managing

Director, notified Continental that the parts that were coming in were damaged, bent, and were

jamming up the equipment.[143]  And in an affidavit, Gemart stated:

---

[137]     *See* pages 40-41 above.

[138]     *See* U.C.C. § 2-607(3)(a).

[139]     *Besicorp Group, Inc. v. Thermo Electron Corp.*, 981 F.Supp. 86, 102 (N.D.N.Y. 1997) (citing U.C.C. § 2-607, at Comment 4).

[140]     *Computer Strategies, Inc. v. Commodore Business Machines, Inc.*, 105 A.D.2d 167, 176, 483 N.Y.S.2d 716, 723 (2nd Dep't 1984), *appeal and reargument denied* 110 A.D.2d 743 (2d Dep't 1984) (citing U.C.C. § 2-607, at Comment 4).

[141]     *Cliffstar Corp.*, 254 A.D.2d at 724 (citing *Cuba Cheese v. Aurora Val. Meats*, 113 A.D.2d. 1012, 494 N.Y.S.2d 571 (4th Dep't 1985).

[142]     *See* Gemart declaration, dated Oct. 25, 2006 ("**Gemart Decl.**"), ¶¶ 3-4; Schneider Deposition Tr., at 65: 6-23.

[143]     *See* Polytek Opposition Br., at 20 (citing Schneider Deposition Tr., at 65: 6-23).

Continental argued that Schneider's testimony that Arthur Cooijmans notified Continental about the defective parts is hearsay and should not be considered.  These statements are not being offered here to prove that the parts were in fact defective, but rather to prove that Cooijmans gave notice to Continental.  But if Schneider did not personally observe the conversations between Cooijmans and Continental, then this testimony is hearsay.  Schneider's testimony implies but does not establish that he personally observed Cooijmans contacting and notifying Continental.  Both parties are on notice that if Schneider cannot establish that he has personal knowledge of these facts, his statements here would be excluded at a further

---

> The shipments often contained several defective products
> that could not [be] used in manufacture of the sprayers.  It
> was our policy to contact Continental within 24 hours of
> the inspection to advise them of the defective condition of
> the shipment and seek a credit and/or replacement parts.
>
> This was an ongoing problem with regard to the poor
> condition of the parts and with regard to receiving a credit
> or replacement from Continental.  I personally called
> Continental on several occasions to advise them of
> defective parts that arrived in the shipments, and the issue
> was also brought to Continental's attention by Polytek's
> former buyer Ger Classon, and former managing director
> Arthur Cooijmans."[144]

Gemart also stated that shipments of parts were inspected by Polytek's inspection department

"upon delivery," and that it was Polytek's policy to notify Continental within 24 hours of

inspecting the goods to advise them of the defective condition of the shipment.[145]

Continental does not dispute these facts.  Thus, there is no disputed issue of fact with

respect to notice.  Rather, the parties disagree as the significance of Polytek's actions as a matter

of law.

Polytek's actions did not rise to the level of rejection or revocation as a matter of law.

Polytek did in fact communicate its dissatisfaction with the parts to Continental.  But mere

complaint is insufficient for rejection or revocation.[146]  And as Continental noted, there is no

evidence that Polytek returned the goods, provided documentation regarding the storage of

---

trial.  However, because Polytek provided other admissible evidence which raises a disputed issue of fact as to whether Polytek notified Continental of the defective parts (testimony from Gemart that he personally contacted Continental), the Court need not address the admissibility of Schneider's testimony now.

[144] Gemart Decl., ¶ 3-4.  Unless Gemart personally observed Ger Classon and Cooijmans' conversations with Continental, Gemart's statements to that effect are hearsay.  *See* note 143 above.  The portion of Gemart's testimony stating that he personally called Continental is admissible evidence.

[145] *See* Gemart Decl., ¶ 3.

[146] It does not appear that Polytek contends that it either rejected or revoked acceptance of the goods.  Rather, all of the cases that Polytek cited address when a party that *has accepted the goods* is entitled to damages under U.C.C. § 2-714.

goods, or invited Continental to inspect or pick up the goods.  Therefore, the Court finds as a

matter of law that Polytek accepted, and did not reject or revoke acceptance of the parts supplied

by Continental.

But as discussed above, the requirements under § 2-607(3)(a) for a buyer to recover

damages for accepted goods are far less rigorous.  Polytek's notice to Continental did not detail

the nature of the defects in the products, and was oral rather than written, but such notice was

nevertheless sufficient under § 2-607(3)(a).  In addition, because Polytek inspected shipments

from Continental upon delivery, and notified Continental of a defective shipment within 24 hours

after inspection, Polytek's notice to Continental was timely under § 2-607(3)(a).  Thus, the

substance and form of the notice Polytek gave to Continental about the defective parts satisfied

the less rigorous requirements of § 2-607(3)(a) as a matter of law.  Polytek is therefore entitled to

recover damages from Continental (or assert a setoff) as long as Polytek also proves that the

parts were actually defective.

### 2.  *Defective Parts*

But Polytek is only entitled to damages if the parts were in fact defective.[147]  Under

U.C.C. § 2-607(4), because Polytek accepted the parts, it bears the burden of establishing that

Continental breached the implied warranties of merchantability and fitness for a particular

purpose.[148]  Although the party moving for summary judgment has the burden of demonstrating

---

[147]      As noted above, page 42, where the buyer has accepted goods and given notification,

> The measure of damages for breach of warranty is the difference at the time and
> place of acceptance between the value of the goods accepted and the value they
> would have had if they had been as warranted, unless special circumstances
> show proximate damages of a different amount.
> U.C.C. § 2-714(2).

The buyer may also recover incidental and consequential damages under §2-715.

[148]      *See* U.C.C. § 2-607(4) ("The burden is on the buyer to establish any breach with respect to the goods
accepted.").

-45-

the absence of a genuine issue of material fact, that party can "discharge this burden by

demonstrating to the Court that there is an absence of evidence to support the non-moving

party's case on which that party would have the burden of proof at trial."[149]  As a result,

Continental need not provide any evidence that the products it supplied were not defective, and

may simply point to Polytek's lack of evidence on this issue.  Because Polytek will bear the

burden to prove defectiveness at trial, Fed. R. Civ. P. 56 "requires the nonmoving party to go

beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories,

and admissions on file, designate specific facts showing that there is a genuine issue for trial.[150]

At summary judgment, "we go beyond the paper allegations of the pleadings, which were

enough to survive the common law demurrer.  The time has come, as James and Hazard put it,

'to put up or shut up.'  Accordingly, unsupported allegations do not create a material issue of

fact."[151]

    "The principles governing admissibility of evidence do not change on a motion for

summary judgment."[152]  Federal R. Civ. P. 56 provides that affidavits submitted by a party

moving for summary judgment or one opposing summary judgment must be made on personal

knowledge, set out facts that would be admissible in evidence, and show that the affiant is

competent to testify on the matters stated.[153]  And similarly, "a motion to strike is appropriate if

---

[149]     *Prescription Plan Servs.*, 783 F. Supp. at 819 (citing *Celotex*, 477 U.S. at 323).

[150]     *Celotex*, 477 U.S. at 324.

[151]     *Weinstock v. Columbia University*, 224 F.3d 33, 41 (2d Cir. 2000) (citing Fleming James,
         Jr. & Geoffrey C. Hazard, Jr., Civil Procedure 150 (2d ed.1977)).

[152]     *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("***Raskin***").  At the hearing, Polytek's counsel stated,
         "That is what we have to do under Rule 56.  We have to submit evidence that would be admissible at trial
         to show an issue of fact."  Hr'g Tr. 8/17/06 at 14.

[153]     *See Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004).

documents submitted in support of a motion for summary judgment contain inadmissible hearsay or conclusory statements, are incomplete, or have not been properly authenticated."[154]

In support of its contention that Continental's supplied defective parts, Polytek submitted documents, an affidavit from Gemart, and deposition testimony from Schneider. Continental raises various evidentiary objections to this evidence.

Continental argues that Polytek's documents were not authenticated.[155] In *Bazak International,* a case cited by Continental, Judge Marrero of this district noted that at summary judgment, "[t]his threshold determination is relatively low, as evidence is admissible as authentic 'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'"[156] Judge Marrero determined that the letter at issue was sufficiently authenticated for the purpose of summary judgment where "[b]oth Feldman and his employee Luis Gonzales ("Gonzales") attest[ed] that the letter was handwritten by Feldman, and subsequently typed on the computer and sent to Tarrant by Gonzales."[157]

And in a more recent case from this district, Chief Judge Preska addressed whether performance reviews submitted on a motion for summary judgment had been properly authenticated or must be struck.[158] She determined that the "[d]efendant has failed to support any of the offered records with a proper affidavit. The affidavit of defense counsel, who lacks personal knowledge as to the creation or maintenance of Defendant's records, is insufficient to

---

[154]    *Spector v. Experian Info. Servs., Inc.,* 321 F.Supp.2d 348, 352 (D.Conn. 2004). *See also ABB Indus. Sys., Inc., v. Prime Tech.* 120 F.3d 351, 357 (2d Cir. 1997) (stating that inadmissible hearsay cannot be used to raise a triable issue of fact to defeat a summary judgment motion).

[155]    *See* Continental Reply Br., at 8.

[156]    *Bazak Intern. Corp. v. Tarrant Apparel Group*, 378 F. Supp. 2d 377, 391 (S.D.N.Y. 2005) ("***Bazak Intern.***") (citing *U.S. v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991), *cert. denied,* 502 U.S. 938 (1991)).

[157]    *Bazak Intern.*, 378 F.Supp. at 391.

[158]    *See Kaur v. New York City Health and Hospitals Corp.*, 688 F.Supp.2d 317 (S.D.N.Y. 2010) .

certify their authenticity."[159]  However, she found that circumstantial evidence supported a

conclusion of authenticity in that case.[160]

    But those cases are distinguishable.  The documents presented here appear to be

inspection reports made by employees at Polytek demonstrating that some of the parts Polytek

received from Continental were defective.[161]  They were attached to an affidavit from Polytek's

counsel, who lacked personal knowledge, and were not authenticated or referenced in any other

affidavits or deposition testimony provided by Polytek.  In addition, there is insufficient

circumstantial evidence to support authentication here.  The majority of the writing in these

documents is not in English, and no translations of it were provided by Polytek.[162]  The only

words that the Court can make out on these documents are the names "Polytek" and

"Continental" and some phrases indicating some problems with some unidentifiable products.

Even in light of the "relatively low"[163] threshold for determining authenticity at summary

judgment, I find that these documents were not properly authenticated and cannot be considered

on this motion.

    Continental further argues that Schneider's deposition testimony regarding the defective

products was hearsay.[164]  Continental is right in part, but only in part.  Some portions of

---

[159]    *Id.* at 323.

[160]    *Id.* at 324 (pointing to the fact that all documents were on the defendant's letterhead, that witnesses had
         testified to the existence of a performance review policy, that some of the evaluations were signed by the
         plaintiff herself, that some of the reviews were identified by the plaintiff in her deposition testimony, and
         that there was no indication that the documents were produced in contemplation of litigation as
         circumstantial evidence to support authenticity).

[161]    Polytek did not even identify these documents as inspection reports.  The Court identifies them as such here
         because they say "Inspectie Rapport" at the top, which the Court assumes are cognates of English words.

[162]    In addition to the authenticity problem, the fact that these documents are not in English and that Polytek
         failed to provide the Court with a translation may be an independent and sufficient ground for excluding
         them.

[163]    *Bazak Intern.*, 378 F. Supp. 2d at 391.

[164]    *See* Continental Reply Br., at 8.

Schneider's testimony on this issue are hearsay.[165]  However, Schneider also testified that he

*personally* saw the defects in the parts, and he explained in some detail what the defects were.[166]

In addition, he testified that the percentage of parts received by Polytek that were defective was

probably between 10 and 30%.[167]  These portions of Schneider's testimony are not hearsay

because they contain no out-of-court statements.

Turning now the substance of the motion, I find that Polytek has raised a disputed issue

of fact as to whether some of the parts it received from Continental were defective.  In addition

to the admissible portions of Schneider's testimony, Gemart's affidavit supports Polytek's

assertion that some of the Continental parts were defective.  Gemart testified that "[t]he

shipments often contained several defective products that could not be used in manufacture of

the sprayers."[168]

The testimony from Gemart and Schneider, and any other evidence, may ultimately fail

to meet Polytek's burden of "establish[ing] any breach with respect to the goods accepted."[169]

However, Polytek has provided some admissible evidence supporting its contention that some of

the parts were in fact defective, and has thus raised a disputed issue of fact.  And of course,

whether the parts were in fact defective is material to whether Polytek is entitled to damages as a

matter of law.

In sum, the court finds that Polytek provided timely and proper notice of defective parts

under U.C.C. § 2-602(4), and that Polytek raised a disputed issue of fact as to whether some of

---

[165]    *See, e.g.,* Schneider Deposition Tr., at 65: 17-20 (Schneider's testimony stating that Cooijmans told Continental that some of the parts were defective).  It is hearsay if used for the purpose of proving that the parts were in fact defective (i.e. for the truth of the matter asserted).

[166]    *Id.* at 66.  *See also id.* at 65: 7-11.

[167]    *Id.* at 67.

[168]    Gemart Decl., ¶ 3.

[169]    U.C.C. § 2-602(4).

-49-

the parts it received from Continental were defective.  Continental has failed to meet its burden

of establishing that Polytek is not entitled to damages as a matter of law.  Therefore, summary

judgment on Continental's claim and Polytek's counterclaim must be denied.

E. The OpAd Sprayer Agreements

On October 19, 2000, Continental and Polytek entered into a License Agreement with

respect to the OpAd spray devices and the intellectual property associated with it, which was

later amended on March 13, 2002.  Pursuant to the OpAd Sprayers License Agreement, Polytek

granted to Continental the following two rights:

> (A) the exclusive right within [North, South, and Central America] to
> manufacture, assemble, distribute and sell OnePak Products and to use
> the Intellectual Property and Technical Information . . . and
>
> (B) a non-exclusive right to sell OpAd Products to any U.S. Consumer
> of the OpAd Products in Asia . . . . [170]

The OpAd Sprayers License Agreement obligated Continental to, among other things:

(a) pay royalties to Polytek once Continental purchased the machine to

produce OpAd sprayers, and began producing them;[171]

(b) establish a written a written marketing plan for OpAd in the Territory

by June 30, 2002;[172]

(c) "promptly commence and thereafter during the Royalty Payment Term

of the license granted in Section 2.1 diligently pursue the marketing and sale of

the OnePak products in the Territory. . . .";[173] and

---

[170]    OpAd Sprayers License Agreement, § 2.1.

[171]    *Id.* at Art. III.

[172]    *Id.* at § 2.5.3.

[173]    *Id.* at § 2.5.1.

(d) "promptly and diligently proceed with [USA Detergents, Inc.] in order
to convert the Letter of Intent into a legally binding contract for the purchase of
OpAd sprayers . . ."[174]

On March 13, 2002, Continental and Polytek also entered into the OpAd Sprayers Supply
Agreement. The Agreement provided that Polytek would supply OpAd sprayers to Continental
until Continental purchased its own machine for producing OpAd spray devices and that
machine was properly operating, or until the expiration of the OpAd License.[175] The Agreement
further provided that Continental would immediately commence diligent marketing efforts (as
contemplated by the OpAd Sprayers License Agreement) and would "diligently pursue the
gradual increase of purchases of OpAd Product or demonstrate third party customer orders or
contracts of the OpAd Product so as to reach, in the aggregate, a constant volume of 3,000,000
OpAd units a month by June 30, 2003."[176] Continental also agreed to provide monthly forecasts
for its supply requirements after June 30, 2002.[177] Lastly, Continental agreed to purchase three
million OpAd spray devices per month after July 1, 2003, until such time as Continental's
Machine was capable of producing spray devices for commercial sales.[178]

Both the OpAd Sprayers License Agreement and OpAd Sprayers Supply Agreement
contain cross-default clauses providing that if Continental materially breaches any agreement

[174]    *Id.* at § 2.5.2. As noted in this section, Indesco had previously entered into a letter of intent, dated November 6, 2001, with USA Detergents, Inc. ("**USA Detergents**") regarding sale of OpAd sprayers to USA Detergents.

[175]    *See* OpAd Sprayers Supply Agreement, § 2.1.

[176]    *Id.* at § 2.3.

[177]    *Id.*

[178]    *Id.*

between the parties, it will be in default under the OpAd Sprayers License Agreement and OpAd

Supply Agreement as well.[179]

Polytek asserts that Continental breached the OpAd Sprayers License Agreement by

failing to pursue the USA Detergents letter of intent, and by failing to make reasonable efforts to

market and sell OpAd Products, as required by the License Agreement.  And Polytek contends

that Continental breached the OpAd Sprayers Supply Agreement by: (i) failing to initiate

marketing efforts with "a view toward commencing purchases of OpAd sprayers;" (ii) failing to

provide Polytek with a monthly written forecast of its OpAd supply requirements; and (iii)

failing to gradually increase purchases so as to reach a constant volume of purchases of three

million units per month by June 30, 2003.[180]  As a result of these alleged breaches, Polytek

terminated both OpAd Agreements by letter on February 20, 2003.[181]  Polytek seeks damages in

the amount of no less than $5 million for the lost royalties that it would have earned pursuant to

the License Agreement and another $5 million in lost profits it would have earned under the

Supply Agreement.  It is undisputed that Continental did not purchase any OpAd Sprayers from

Polytek, nor did Continental provide evidence of third-party customer orders or contracts for

purchase.[182]

---

[179]    *See* pages 10-12 above.

[180]    *See* Polytek Answer, ¶¶ 94-99.

[181]    *See* Schneider 2/20/03 Letter.  Polytek's Managing Director Yehochai Schneider notified Continental by
letter that:

> For the reasons state above, and your failure to cure the various defaults existing
> under the Supply Agreement and the License Agreement despite ample
> opportunity to do so and notices by Afa Polytek to that effect, we see no other
> choice but to terminate ContinentalAFA's license under the License Agreement,
> and its rights under the Supply Agreement and all related agreements, effective
> immediately.
> *Id.* at 3.

[182]    Continental Rule 7056-1 Reply Statement, at 12, ¶ 31.

In response, Continental contends that it fulfilled its obligations with respect to the USA Detergents letter of intent.  Continental also asserts that its efforts to market the OpAd sprayer satisfied any obligation it had under both the OpAd License and the Interim Supply Agreement, and that any inability to sell OpAd sprayers resulted from Polytek's high pricing of the product.

In addition, Continental argues that even if it did breach its obligations under these Agreements, Polytek is not entitled to recover these damages as a matter of law.  With respect to the lost royalty damages under the OpAd Sprayers License Agreement, Continental argues that Polytek cannot recover because the Agreement terminated prior to Continental owing Polytek any royalties.  With respect to OpAd Sprayers Supply Agreement, Continental argues that Polytek is not entitled to relief because the Agreement precludes claims for lost profits.  Finally, Continental argues that Polytek has failed to provide any evidence of lost profit damages.

1.  *Continental's Alleged Breaches*

a.  *Failure to Pursue the USA Detergent Letter of Intent*

Pursuant to the OpAd Sprayers License Agreement, Continental was obligated to "promptly and diligently proceed with [USA Detergents] in order to convert the Letter of Intent into a legally binding contract for the purchase of OpAd sprayers."[183]  However, the OpAd Sprayers License Agreement further provided that "Nothing herein shall require Licensee to enter into any agreement that is not consistent with or adds material terms to the Letter of Intent."[184]  The letter of intent itself was not a binding agreement.[185]

Continental argues that USA Detergents was not willing to enter into a contract under the terms of the letter of intent, and therefore, that Continental fulfilled its obligations under section

---

[183]     OpAd Sprayers License Agreement, § 2.5.2.

[184]     *Id.*

[185]     *See* Wagner Aff. I, Ex. W ("**USA Detergents Letter of Intent**"), ¶ 19.

2.5.2 of the OpAd Sprayers License Agreement. Continental provided the testimony of Ben

Holder, who was a general manager at Continental and was in charge of marketing the OpAd

products. He testified that the president of USA Detergents informed him that "he had no

incentive to change over to OpAd and went with an Asian unit."[186]

Polytek's position is that *Continental* demanded a price above the price established in the

letter of intent, and that, as a result, USA Detergents was unwilling to enter into a binding

contract. Polytek provided testimony from Yehochai Schneider, who stated that:

> At some point I also learned that Continental had abandoned the
> deal with USA Detergents ("USAD") and failed to convert the
> letter of intent that had previously been negotiated into a binding
> contract. It is my understanding that Continental suddenly
> demanded 18¢ per unit from USAD, rather than the 14¢ that was
> agreed to in the letter of intent.[187]

This testimony is inadmissible hearsay.[188] Polytek made no showing that Schneider, as

managing director of Polytek, had personal knowledge of the conversations that transpired

between Continental and USA Detergents. Therefore, it cannot be considered at summary

judgment.

However, Polytek did provide some admissible evidence in support of its position that

Continental demanded a higher price from USA Detergents or otherwise voluntarily walked from

the deal. Elsewhere in his deposition, Holder testified that Steve Bowsher, then CEO of

Continental, told Holder not to go forward with any further discussions with USA Detergents

---

[186]      Glenn Decl. II, Ex. 32 and Wagner Aff. I, Ex. Z ("**Holder Deposition Tr**."), at 105-06.

[187]      Schneider Aff., ¶ 22.

[188]      *See* page 46 above ("The principles governing admissibility of evidence do not change on a motion for
summary judgment." *Raskin,* 125 F.3d at 66).

sometime between May and June of 2002.[189]  Holder also testified that Continental was generally marketing the OpAd products at 16 to 18¢.[190]

Although this evidence is thin, it is enough to defeat summary judgment.  A reasonable trier of fact might find that Continental demanded a price from USA Detergents above the price established in letter of intent, or otherwise abandoned the USA Detergents deal, such as by reason of what Bowsher told Holder.  This disputed issue of fact is material to whether Continental breached its obligations with respect to the USA Detergent letter of intent.  Pursuant to the terms of section 2.5.2 of the OpAd Sprayers License Agreement, there are no conditions to Continental's obligation to "promptly and diligently" pursue a binding contract with USA Detergent according to the terms of the letter of intent.  If in fact Continental did demand a higher price than the 14¢ in the letter of intent or decided to abandon the potential deal altogether, then Polytek could establish that Continental breached its obligations under this section of the License Agreement.

> b.    *Failure to Market OpAd Products*

Polytek also raises a disputed issue of fact as to whether Continental breached its obligation to pursue a marketing plan for the OpAd products under both OpAd Agreements.

Section 2.5.2 of the License Agreement provides that Continental "shall promptly commence and thereafter during the Royalty Payment Term of the license . . . diligently pursue the marketing and sale of OnePak Products [in North, South, and Central America]."[191]

Continental's obligation to commence some form of marketing plan began "promptly" from the date of the execution of the Agreement.  Though the obligation would only persist as

---

[189]     *See* Holder Deposition Tr., at 109.

[190]     *See id.* at 114.

[191]     OpAd Sprayers License Agreement, § 2.5.1.

long as the Royalty Payment Term endured, Continental's commitment to *commence* the

marketing and sale of OnePak Products was *not* tied to the Royalty Payment Term.[192]

Polytek submitted the deposition of Ben Holder, who was put in charge of marketing

OpAd sprayers in March 2002.[193]  The marketing plan he came up with was only three pages,[194]

and Holder acknowledged that his recommendations in the plan were not based on any formal

market research.[195]  In addition, Schneider testified that:

> In my 40 years of active involvement in manufacturing, I have
> reviewed and participated in dozens of marketing and sale plans
> for [a] new product launch.  I can state unequivocally that I have
> never witnessed such a non-professional, and I daresay, childish,
> presentation.  It contained no market analysis, no marketing
> program, and no strategy for positioning OpAd relative to
> Continental's other products.[196]

Even though the OpAd products did not generate a lot of interest at that price, at least as long as

Holder remained in his position, Continental did not lower the price.[197]  During the summer of

2002, Thomas Richmond replaced Steven Bowsher as CEO of Continental.  In November or

December 2002, Holder was transitioned out of his position as head of marketing for OpAd.  He

---

[192]     "Royalty Payment Term" is defined as "the period commencing on the date on which [Continental]
commences Commercial Sales of OpAd products manufactured on its Machine and ending on the date
which is the eighth anniversary of such date . . ."  *Id.* at § 1.2.1.  "Machine" is defined as collectively, an
assembly machine used for the sole purpose of assembling OpAd sprayers and either molds to make OpAd
parts or contracts for an adequate supply of OpAd parts.  *See Id.*  It is undisputed that Continental never
purchased the Machine and never manufactured OpAd products on its own.  Therefore, the Royalty
Payment Term never commenced.

[193]     Ben Holder was a general manager at Continental.  *See* page 54 above.

[194]     *See* Wagner Aff. I, Ex. K.

[195]     *See* Holder Deposition Tr., at 89.  Holder also testified that Continental marketed the OpAd products in the
16-18¢ range.  *See id.* at 114.

[196]     Schneider Aff., ¶ 21.  While Schneider's opinions may or may not turn out to be admissible at trial, Polytek
will be able to make the points in the last sentence.

[197]     *See* Holder Deposition Tr., at 115.

was not replaced, but rather, the responsibility for the OpAd business was transferred to

Richmond, the new CEO.[198]

Continental's duty to commence marketing began immediately upon the execution of the

License Agreement, irrespective of whether the Royalty Payment Term had begun.  In light of

this evidence, Polytek raises a disputed issue of fact as to whether Continental breached its

obligations under the OpAd License and Interim Supply Agreements to market the OpAd

products.[199]

    2.   *Damages*

       *a.   General vs. Consequential Lost Profit Damages*

For Continental's alleged breach of the OpAd Sprayers License Agreement, Polytek

seeks lost royalties, a form of lost profit damages.  And with respect to the OpAd Sprayers

Supply Agreement, Polytek seeks lost profits, measured by the difference between the cost of

manufacturing each unit and the contract price.[200]  Polytek contends that both are direct or

general contract damages as contrasted to consequential damages, the latter of which cannot be

recovered under the OpAd Parts Supply Agreement and are subject to a higher standard of proof.

In support, Polytek asserts that New York law recognizes two types of lost profits—those that

are consequential damages and those that are direct, general contract damages—and that its

damages are the latter type.

---

[198]    *See id.* at 119-120.

[199]    In addition, the OpAd Sprayers License Agreement and the OpAd Sprayers Supply Agreement contain cross-default clauses.  *See* pages 10-12 above.   The Court found above that Polytek raised a disputed issue of fact as to whether Continental breached the Machinery Lease Agreement.  If that alleged breach was material, then Continental would be in default under the two OpAd Agreements as well.

[200]    *See* Polytek Opposition Br., at 29-36; Hr'g Tr. 8/17/06 at 53-55.

Polytek points to two cases in support of its argument that the damages that it seeks here are direct damages, rather than consequential damages.[201]  Since this motion was briefed and heard, the Second Circuit has issued a decision directly on point.[202]  In *Tractebel Energy*, the Circuit clarified:

> Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements. In the typical case, the ability of the non-breaching party to operate his business, and thereby generate profits on collateral transactions, is contingent on the performance of the primary contract. When the breaching party does not perform, the non-breaching party's business is in some way hindered, and the profits from potential collateral exchanges are "lost." . . .
>
> By contrast, when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages. The damages may still be characterized as lost profits since, had the contract been performed, the non-breaching party would have profited to the extent that his cost of performance was less than the total value of the breaching party's promised payments. But, in this case, the lost profits are the direct and probable consequence of the breach. The profits are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed.[203]

Polytek, therefore, is correct.

The damages that Polytek seeks under the OpAd Sprayers Supply Agreement are "lost profit" damages, but they are general, rather than consequential, lost profit damages.  Polytek is

---

[201]  *See ATI Telecom, Inc., v. Trescom*, No. 95-Civ.-9749, 1996 WL 455010, 1996 U.S. Dist. LEXIS 11479 (S.D.N.Y. 1996) (Chin, J.) ("**ATI Telecom**") (finding that damages sought by ATI, a company engaged in the business of reselling long distance service to retail establishments, were direct damages, even though the damages the constituted the difference between the contract price and the price ATI paid on the market to a third party and compensation for a reduction in ATI's profits);  *American List Corp. v. U.S. News and World Report, Inc.*, 75 N.Y.2d 38, 42, 549 N.E.2d 1161, 1164, 550 N.Y.S.2d 590, 593 (1989) ("**American List Corp.**") (finding damages sought by plaintiff to be direct damages where plaintiff sought recovery of money that the defendant was obligated to pay under the contract, and which were set out in a schedule of costs in the contract, less the costs reasonably saved by the plaintiff as a result of the breach).

[202]  *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89 (2d Cir. 2007) ("**Tractebel Energy**").

[203]  *Id.* at 109.  In support, the Second Circuit cited *American List Corp.*, a case upon which Polytek relied.

not seeking profits that it would have made from collateral business transactions with third

parties, but rather, profits it would have made from Continental's purchases of sprayers pursuant

to the Agreement.

The lost royalty damages that Polytek seeks under the OpAd Sprayers License

Agreement for the USA Detergents deal are also general, rather than consequential, lost profit

damages.  Although the royalties arise out of transactions that Continental would enter into with

third parties, the License Agreement obligated Continental to enter into such agreements with

third parties—at least in the case of USA Detergents, and at least insofar as USA Detergents

would agree to a contract on the terms of the letter of intent.

In a case from the District of Massachusetts, Judge O'Toole decided that similar lost

royalty damages were direct, rather than consequential.[204]  In *Callisto*, the two parties had

entered into a license and distribution agreement pursuant to which Callisto licensed its digital

photo album computer program to Inter-State, and Inter-State was obligated to use its best efforts

to market and sell the computer program in a bundle.[205]  When Inter-State stopped performing,

Callisto terminated the Agreement and sued for lost royalties.  Judge O'Toole determined:

> Here, the royalty payments were expressly required by the
> Agreement and constituted Inter-State's primary consideration for
> the license it obtained. The loss of such royalties would be the
> natural and probable consequence of a failure to perform by Inter-
> State and should not be considered consequential damages.[206]

Similarly, if in fact Continental breached the OpAd Sprayers License Agreement by

failing to pursue the USA Detergents deal, then the lost royalty payments sought by Polytek

---

[204]     *Callisto Corp. v. Inter-State Studio & Pub. Co.*, No. 05-11953-GAO, 2006 WL 1240711, 2006 U.S. Dist. LEXIS 31004 (D. Mass. May 4, 2006) ("***Callisto Corp.***").

[205]     *See id.*, 2006 WL 1240711, at *1, 2006 U.S. Dist. LEXIS 31004, at *1.

[206]     *Id.*, 2006 WL 1240711, at *2, 2006 U.S. Dist. LEXIS 31004, at *6.

-59-

would be the natural and probable consequence of that breach, and therefore, would not be

consequential damages.

The distinction between direct, general lost profit damages on the one hand, and

consequential lost profit damages on the other, is significant here for two reasons: first, because

Polytek contends that the limitation on damages contained in the OpAd Sprayers Supply

Agreement bars only *consequential* lost profit damages; and second, because different standards

of proof govern the two different types of lost profit damages.

> b.   *Limitation on Damages in the OpAd Sprayers Supply Agreement*

Continental further contends that pursuant to the terms of the Interim Supply Agreement,

Polytek cannot recover any lost profit damages under that Agreement.  Polytek asserts that the

language bars recovery of consequential lost profits, but not general lost profits.

The OpAd Sprayers Supply Agreement provides:

> 4.1.1. Limitation on Damages.  Notwithstanding any of the
> contrary provision[s] herein:
>
> NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR
> ANY PUNITIVE, CONSEQUENTIAL, LIQUIDATED,
> INCIDENTAL OR INDIRECT DAMAGES, INCLUDING
> DAMAGES FOR LOST PROFITS (EXCEPT AS PROVIDED IN
> SECTION 4.1.2 BELOW), LOSS OF OPPORTUNITY OR USE
> OF ANY KIND, SUFFERED BY THE OTHER PARTY,
> WHETHER IN CONTRACT, TORT OR OTHERWISE.
>
> 4.1.2. Failure to Deliver.  If Supplier fails to deliver any OpAd
> Sprayers in accordance with an order submitted by Indesco
> pursuant to Section 2.5 hereof, the purchase requirement under
> Section 2.3 hereof shall be reduced by the number of unit sales lost
> as a result of such failure to deliver and Indesco shall be entitled to
> recover from Supplier lost profits on such sales.[207]

---

[207]   OpAd Sprayers Supply Agreement, § 4.1.  It is clear that under section 4.1.2., Continental is entitled to
recover lost profits for a breach by Polytek.  Therefore, Section 4.1.1., as least in so far as it limits recovery
of "lost profits," only applies to Polytek.

As Continental points out, the language of the Agreement does not distinguish between indirect and direct "lost profit" damages, which might suggest that both are prohibited.

However, Polytek's reading of the clause is the only reasonable one. Section 4.1.1 provides that the parties may not recover punitive, consequential, liquidated, incidental, or indirect damages, *including* lost profits. Under the doctrine of *noscituur a sociis*, "a word is known by the company it keeps."[208] The word "including," which proceeds "lost profits," demonstrates that the lost profits prohibited by section 4.1.1 are those that are a subset of "punitive, consequential, liquidated, incidental, or indirect damages." In other words, "lost profits" are only precluded insofar as they fall within the broader categories of indirect or consequential damages.[209] And subsequently, lost profit damages that are direct or general, and not within a subset of "punitive, consequential, liquidated, incidental, or indirect damages," can be recovered.

Therefore, Section 4.1.1 does not, as a matter of law, preclude Polytek from recovering the lost profits it seeks for Continental's alleged breach of the Interim Supply Agreement. The OpAd Sprayers License Agreement does not contain a limitations of damages clause.

---

[208] *In re Motors Liquidation Co.*, No. 09-50026, ---B.R.---, 2011 WL 18945, at *4, 2011 Bankr. LEXIS 11, at *13 (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)). *See also* N. Singer & J. Singer, Sutherland Statutes and Statutory Construction § 47.16 (7th ed. 2007).

[209] *See ATI Telecom*, 1996 WL 455010, at *2-3, 1996 U.S. Dist. LEXIS 11479, at *5-7 (finding that provision in contract that "In no event will either party under this Agreement be liable for indirect, consequential, special, incidental or punitive damages, or lost profits, revenue, customers, goodwill or opportunity, of any kind whatsoever, resulting from a breach of this Agreement by such party," did not bar recovery for direct damages).

### c.  Standards for Recovery of General vs. Consequential Lost Profit Damages

In *Tractebel Energy*, the Second Circuit also articulated the different standards for the recovery of consequential lost profits and general lost profits.[210] "[T]here exists a higher burden for proving consequential damages than for general damages."[211]

"In New York, a party is entitled to recover [consequential] lost profits only if (1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties."[212]

All damages, whether general or consequential, "must not be merely speculative, possible, and imaginary, but they must be *reasonably certain* and such only as actually follow or may follow from the breach of contract."[213]  A [f]ailure to demonstrate such non-speculative damages will result in summary judgment in favor of the defendant.[214]

While consequential lost profit damages can only be recovered when such damages are foreseeable or within the contemplation of the parties,[215] there is no such requirement for the recovery of general lost profit damages.[216]

---

[210]    *See Tractebel Energy*, 487 F.3d at 110-11.

[211]    *Id.* at 111.

[212]    *Id.* at 109 (citing *Kenford Co., Inc. v. County of Erie*, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986) ("***Kenford I***")).

[213]    *Id.* at 110 (citing *Wakeman v. Wheeler & Wilson Mfg. Co.*, 56 Sickels 205, 209, 101 N.Y. 205 (1886)) (emphasis added by Second Circuit).

[214]    *See Upper Deck Co., LLC v. Breakey Intern., BV*, 390 F.Supp.2d 355, 362 (S.D.N.Y. 2005) (Cederbaum, J.) ("***Upper Deck***").

[215]    *See id.* at 358 (citing *Kenford I*, 67 N.Y.2d at 261).

[216]    *See M & G Polymers USA, LLC v. Carestream Health, Inc.*, No. 07C-11-242 PLA, 2010 WL 1611042, at *37, 2010 Del. Super. LEXIS 131, at *114 (Del.Super. 2010) (stating that under New York law, "[n]o parallel foreseeability or contemplation requirement exists as an obstacle to an aggrieved buyer's direct damages claim"), *aff'd*, 9 A.3d 475, 2010 WL 4657943, 2010 Del. LEXIS 577 (Del. 2010)

And while consequential damages may be recovered only where the amount of loss is also "capable of proof with reasonable certainty"[217] with respect to general damages, however, the amount need not be reasonably certain.  As the Second Circuit stated, "'[c]ertainty,' as it pertains to general damages, refers to the *fact* of damage, not the amount."[218]  The "long standing New York rule" is that "when the existence of damage is certain, and the only uncertainty is as to its amount, the plaintiff will be not denied a recovery of substantial damages.  Moreover, the burden of uncertainty as to the amount of damage is upon the wrongdoer."[219]  "The non-breaching party need only provide a "'stable foundation for a reasonable estimate' of the damage incurred" before an award of general damages can be made.[220]  "New York courts have significant flexibility in estimating general damages once the fact of liability is established."[221]

Since the damages that Polytek seeks here for lost royalties and lost profits are general damages, Polytek must demonstrate that the existence of the damages is reasonably certain.  But Polytek need not demonstrate that the *amount* is reasonably certain, or that they were foreseeable.

### d.   Lost Royalties under the OpAd Sprayers License Agreement

Continental argues that Polytek is not entitled to damages for any lost royalties under the OpAd Sprayers License Agreement because that agreement did not go into effect until Continental purchased the machine; Continental had only an option, but not an obligation to

---

[217]    *Upper Deck*, 390 F.Supp.2d at 358 (citing *Kenford I*, 67 N.Y.2d at 261).

[218]    *Tractebel Energy*, 487 F.3d at 110 (emphasis in original).

[219]    *Contemporary Mission, Inc., v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977) (internal citations omitted).

[220]    *Tractebel Energy*, 487 F.3d at 110 (citing *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 383, 357 N.Y.S.2d 857, 314 N.E.2d 419 (1974) ("***Washington Square Press***")).

[221]    *Id.* at 112.

-63-

purchase the machine; and Polytek terminated the Agreement before Continental exercised that option.[222]

But the contract unambiguously provides that Continental was *obligated* the purchase the machine by January 1, 2004.  Section 2.2, the "**Covenant to acquire the Machine**" states:

> On or before the Machine Commitment Date, [Continental] agrees to enter into a firm, binding contract(s) to purchase the Machine … If [Continental] shall for any reason not enter into firm binding contract(s) to purchase the Machine on or prior to the Machine Commitment Date, the License granted in Section 2.1 above shall automatically terminate without any need for further action or notice by any person or entity and all rights of [Continental] hereunder shall cease and terminate.[223]

The Covenant to acquire the Machine contains mandatory language: it says that Continental "agrees to enter"—not that Continental "may."  In addition, Article X of the OpAd Sprayers License Agreement states that Continental shall be in default if it commits "[a] material breach by the Licensee in the performance of any covenant . . . contained in this Agreement."[224] Section 2.2 is titled "Covenant to acquire the Machine."  Thus, if Continental failed to purchase the machine, it would constitute a default under the Agreement.  For these reasons, the only reasonable reading of the Agreement is that it created an obligation, and not merely an option.

It is a fundamental principle that "damages for breach of contract should put the plaintiff in the same economic position he would have been in had the defendant fulfilled the contract."[225]

---

[222]   If Continental did in fact breach the OpAd Sprayers License Agreement, then Polytek's termination of the Agreement by letter on February 20, 2003 is irrelevant and does not preclude Polytek from recovering damages.  *See NAS Electronics, Inc. v. Transtech Electronics PTE Ltd.*, 262 F.Supp.2d 134, 145 (S.D.N.Y. 2003) (Koeltl, J.) ("Under New York law, when one party has committed a material breach of contract, the non-breaching party is discharged from performing any further obligations under the contract, and the non-breaching party may elect to terminate the contract and sue for damages.").

[223]   OpAd Sprayers License Agreement, § 2.2(a).  "Machine Commitment Date" is defined as January 1, 2004.  *See id.* at § 1.11.

[224]   OpAd Sprayers License Agreement, § 10.1.

[225]   *Lucente v. International Business Machines*, 310 F.3d 243, 262 (2d Cir. 2002).

Therefore, to calculate the damages Polytek to which is entitled under the OpAd Sprayers

License Agreement or the Interim Supply Agreement, the Court must consider what position

Polytek would have been in had Continental fulfilled all its obligations under the Agreement—in

other words, if Continental had purchased the machine by January 1, 2004. It is true that Polytek

was not entitled to receive royalties until after Continental purchased the machine and began

producing OpAd products on its own. But because Continental had an obligation to purchase the

machine by January 1, 2004, the Court can assume, for the purpose of determining damages, that

this obligation was or would have been fulfilled.

Second, Continental asserts that Polytek cannot recover lost royalty damages for the USA

Detergents deal because Polytek failed to prove with certainty that these sales would have

occurred. Of course, Continental was not unconditionally obligated to enter into a contract with

USA Detergents; Continental was only obligated to enter into the USA Detergents contract upon

the terms set out in the letter of intent. Therefore, to recover these lost royalties, Polytek would

need to demonstrate that but for conduct by Continental, the letter of intent would have

materialized into a binding contract.[226]

As discussed above,[227] Continental's Ben Holder testified that Steve Bowsher, then CEO

of Continental, told Holder in May or June of 2002 not to go forward with any further

discussions with USA Detergents.[228] As determined above, in light of this evidence a reasonable

---

[226]     *See Summit Properties Intern., LLC v. Ladies Professional Golf Ass'n*, No. 07-Civ.-10407, 2010 WL
2382405, at *5, 2010 U.S. Dist. LEXIS 58444, at *13 (S.D.N.Y. June 14, 2010) (deciding at summary
judgment that plaintiff Summit could not seek lost profits from prospective deal with Golfsmith at trial
because "Summit puts forth no evidence to support the allegation that but for LPGA's interference the deal
with Golfsmith was likely to come into fruition").

[227]     *See* pages 54-55 above.

[228]     *See* Holder Deposition Tr., at 109.

-65-

trier of fact might find that Continental demanded a price from USA Detergents above the price established in letter of intent or otherwise voluntarily abandoned the USA Detergents deal.

The Court also determines that with this evidence, Polytek raises a disputed issue of fact as to whether, but for these alleged actions by Continental, the USA Detergents letter of intent would have materialized into binding contract.

If in fact Continental did demand a higher price or abandon the deal, then Continental may be found to have breached its obligations under this section of the License Agreement. And if Continental's conduct, as opposed to any decision by USA Detergents, was the reason that the USA Detergent deal failed to materialize into a binding contract on the terms of the letter of intent, then the lost royalties that Polytek seeks here would be non-speculative and directly traceable to that breach.[229] In other words, Polytek would have met its burden of establishing the existence of these general damages with "reasonable certainty."

In addition, if Polytek establishes that Continental breached these obligations, there is likely to be sufficient evidence for Polytek to satisfy the low burden of providing a "stable foundation for a reasonable estimate" of the amount of lost royalties from the USA Detergents deal.[230] The Letter of Intent provides both the price and quantity for the deal between USA Detergents and Continental.[231] And the OpAd Sprayers License Agreement establishes the amount of royalties that Continental was obligated to pay to Polytek.[232]

For these reasons, summary judgment on this claim is denied.

---

[229]  I don't understand Polytek to be seeking damages for lost royalties under the OpAd Sprayers License Agreement other than those related to the USA Detergents deal. Any such lost royalties would be far more speculative.

[230]  *See Tractebel Energy*, 487 F.3d at 110 (citing *Washington Square Press*, 34 N.Y.2d at 383).

[231]  *See* USA Detergents Letter of Intent.

[232]  *See* OpAd Sprayers License Agreement, § 3.1.

*e.   Lost Profit Damages under the OpAd Sprayers Supply Agreement*

Continental also contends that Polytek cannot recover any lost profits under the Interim Supply Agreement because Polytek did not provide any evidence as to what its lost profits were, and therefore, hasn't demonstrated the existence of lost profits to a "reasonable certainty."

"Absent any evidence to support plaintiffs' claims or amounts, any claim of damages is speculative and unsubstantiated."[233]    Again, because the damages that Polytek is seeking here are general lost profit damages, Polytek must prove the *existence* of the damages to a "reasonable certainty," but need not prove the amount of the lost profits to a reasonable certainty.[234]

Polytek will ultimately bear the burden at trial.  Therefore, Polytek must provide evidence upon which a reasonable trier of fact could determine with reasonable certainty that Polytek would have made a profit by selling OpAd parts to Continental pursuant to the Interim Supply Agreement if Continental had not breached that Agreement—in other words, evidence that Polytek's manufacturing costs for the OpAd sprayers were less than the sale price provided in the Agreement.

At the hearing on the motion, Continental's counsel stated:

> Lost profits are comprised of basically two components: what you
> would have sold them for, which is in the agreement, there is [no]
> doubt about that; but what your costs were to manufacture them.
> All they have put forward, first of all, again going to the damages
> provisions of their disclosures, they say that some day they will
> give us documents to reflect what their damages are.  They never
> did . . .[235]

---

[233]    *Brodeur v. Hayes*, 18 A.D.3d 979, 981, 795 N.Y.S.2d 761, 763 (3d Dep't 2005) (affirming Supreme Court's grant of summary judgment for defendant and dismissal of plaintiff's cause of action seeking damages for legal malpractice because plaintiff had not yet paid underlying judgment, plaintiff had right to indemnification, foreclosure sale netted a surplus, and plaintiff provided no proof of any other damages), *lv. dismissed, lv. denied*, 5 N.Y.3d 871, 808 N.Y.S.2d 134, 842 N.E.2d 19 (2005).

[234]    *See* pages 61-62 above.

[235]    Hr'g Tr. 8/17/06 at 69-70 (apparent transcription error corrected).

-67-

> More importantly, we asked for documents about their damages, and they never produced a single document that demonstrated what their costs of production were, because, obviously, if their costs of production were 15 cents, the contract price to sell us was 14 cents, they have no damages.[236]

And in response, Polytek's counsel stated:

> In terms of damages, they asked questions to Mr. Schneider and to Mr. Gratch as to what the costs of manufacture are; and the truth of the matter is, at that time they didn't know what the cost of manufacture was. Your Honor, there are no documents that point to the cost of manufacture. Cost manufacture takes in all of the components, the amount of electricity that the company pays for, what percentage of that is put to the manufacture of the OpAd. The amount of their payroll. How much or percentage of that is OpAd. All of those kinds of things, of which there is no specific document that we can produce that will show the cost of manufacture. It is testimony that would be given by a person with knowledge, probably Mr. van Gogh, who was again identified as the CFO of the company, and he would have given that kind of testimony, if asked. He wasn't asked. He wasn't deposed. So it is not fair to come up here and say, "We didn't produce a document that showed what our costs were," without also acknowledging that there might not be such a document.[237]

Polytek's counsel stated at the hearing that no single document establishing Polytek's costs exists, and that Continental failed to depose Polytek's officer who would have the relevant personal knowledge. Polytek's counsel misses the point. At trial, Polytek will have the burden of proving that it is entitled to damages. Therefore, at summary judgment, Polytek must provide evidence to at least raise a disputed issue of fact as to whether Polytek's costs were less than the sale price.

At the same time, Polytek's counsel was correct in that its claim for lost profit damages need not be supported by documentary evidence, especially if none exists. Any evidence,

---

[236]    Hr'g Tr. 8/17/06 at 70-71.

[237]    Hr'g Tr. 8/17/06 at 71-72.

including an affidavit from a person with personal knowledge, could be used to establish a

disputed issue here.[238]   And Polytek provided the testimony of Schneider, who testified by

affidavit that:

> Had Continental performed its purchase obligations, in 2003,
> Polytek's cost of these sprayers would have been approximately 10
> to 10.5 cents to manufacture each OpAd Sprayer.  As I previously
> noted, Continental was obligated to purchase 3,000,000 OpAd
> Sprayers a month, at a cost of 14¢ each, until their own OpAd
> Equipment was capable of producing such capacity.  The Amended
> OnePak License Agreement required Continental to purchase the
> OpAd Equipment by January, 2004.  It takes approximately two
> years from the date of purchase for the OpAd Equipment to be
> operational and able to mass produce the sprayers.  Accordingly,
> had Continental fulfilled its obligations under the OpAd
> Agreements, it would have purchased 3,000,000 OpAd Sprayers
> per month, or 36,000,000 annually, for a period of approximately
> three years.[239]

The critical first sentence of this quoted language is highly conclusory, and without

anything more to back it up, might well not be credible at trial.  But though the matter is close, a

reasonable trier of fact might find, based upon it, that Polytek's per unit manufacturing costs

were less than the per unit price Continental was obligated to pay to Polytek under the Interim

Supply Agreement.  Therefore, Polytek has (though just barely) raised a disputed issue as to

whether it would have made a profit from selling OpAd sprayers to Continental if Continental

had not breached the agreement.  And because Continental was obligated to purchase OpAd

parts pursuant to the contract, these damages, if proven at trial, would be would be non-

speculative and directly traceable to Continental's failure to purchase the OpAd parts.  In other

---

[238]   *See Federated Retail Holdings, Inc. v. Sanidown, Inc.*, No. 06-Civ.-6199, 2009 WL 2394528, at *2 n.6, *3,
2009 U.S. Dist. LEXIS 68383, at *8-9 n.6, *10 (S.D.N.Y. Aug. 5, 2009) (finding that affidavit from
defendant company's president proffering that defendant maintained a particular profit margin with respect
to the sale and manufacture of feather and down products was sufficient "information from which a
reasonable fact finder could make a damages determination with reasonable certainty" and denying
plaintiff's motion for summary judgment on defendant's counterclaim for lost profits).

[239]   Schneider Aff., ¶ 19.

-69-

words, Polytek would have met its burden of establishing the existence of these general damages

with "reasonable certainty."  Therefore, summary judgment on this claim is denied.

However, to the extent that Polytek seeks to introduce any documentary evidence in

further support of its claims for lost profit damages under the OpAd Agreements, such evidence

will likely be inadmissible.  Through 2007, Fed. R. Civ. P. 26(a)(1), made applicable by

Bankruptcy Rule 7026, stated:

> [A] party must, without awaiting a discovery request, provide to
> the other parties:
>
> (C) a computation of any category of damages claimed by
> the disclosing party, making available for inspection and copying
> as under Rule 34 the documents or other evidentiary material, not
> privileged or protected from disclosure, on which such
> computation is based, including materials bearing on the nature
> and extent of injuries suffered;[240]

And Fed. R. Civ. P. 37(c)(1), made applicable here by Bankruptcy Rule 7037, provides:

> If a party fails to provide information or identify a witness as
> required by Rule 26(a) or (e), the party is not allowed to use that
> information or witness to supply evidence on a motion, at a
> hearing, or at a trial, unless the failure was substantially justified or
> is harmless.[241]

In its Rule 26(a)(1) Disclosure, Polytek stated:

---

[240]   Fed. R. Civ. P. 26 was revised, and, beginning in 2008, the requirement of initial disclosure of
computations of damages was moved to 26(a)(1)(A)(iii).  Fed. R. Civ. P. 26(a)(1)(A) now states:

> [A] party must, without awaiting a discovery request, provide to the other
> parties:
> (iii) a computation of each category of damages claimed by the
> disclosing party—who must also make available for inspection and copying as
> under Rule 34 the documents or other evidentiary material, unless privileged or
> protected from disclosure, on which each computation is based, including
> materials bearing on the nature of injuries suffered;
> Fed. R. Civ. P. 26(a)(1)(A).

The Drafters' Notes to the 2007 Amendments explain, "The language of Rule 26 has been amended as part
of the general restyling of the Civil Rules to make them more easily understood and to make style and
terminology more consistent throughout the rules.  These changes are intended to be stylistic only."

[241]   Fed. R. Civ. P. 37(c)(1).

C. Response to Rule 26(a)(1)(C)

> Computations of any category of damages in Polytek's possession,
> custody or control will be made available for inspection and
> copying at a time and place convenient to all parties.[242]

Continental's counsel stated at the hearing, without dispute by Polytek, that no documentary

evidence supporting a computation of damages was ever provided.[243]  Unless Continental's

counsel is later shown to have been incorrect, Polytek will have to overcome Rule 37(c)(1) to

present such documents as evidence at trial.[244]

CONCLUSION

For the reasons set forth above, summary judgment on Continental's claim for breach of

contract arising from default on the Machinery Lease is granted, inclusive of all accelerated lease

payments and interest.

Summary judgment for Continental on its two claims arising out of the Polytek Note is

denied.  Summary judgment for Continental on each of its claim and on Polytek's counterclaim

arising out of the CSI Sprayers License Agreement is denied.  Summary judgment for

Continental on each of its claim and on Polytek's counterclaim arising out of the CSI Parts

Supply Agreement is denied.  Finally, summary judgment for Continental on Polytek's claims

arising under the OpAd Sprayers Supply Agreement and OpAd Sprayers License Agreement is

denied.

The principles of law set forth above (upon which the Court ruled on those matter upon

which it did not grant summary judgment, and otherwise) shall constitute the law of the case.

The Court declines to enter a separate judgment, under Fed. R. Civ. P. 54(b) or otherwise, on the

---

[242]     Wagner Aff. II, Ex. DD, at 6.

[243]     *See* Hr'g Tr. 8/17/06 at 69-70, quoted above, pages 67-68.

[244]     *See* Fed. R. Civ. P. 37(c)(1).  *See also Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006).

relatively small portion of this controversy upon which summary judgment was granted.  To the extent that the Court found matters established or not established, such determinations shall be binding going forward pursuant to Fed. R. Civ. P. 56(g).

SO ORDERED

Dated: New York, New York
      April 13, 2011

*s/ Robert E. Gerber*
Honorable Robert E. Gerber
United States Bankruptcy Judge